August M. Zibilich and Elizabeth Zibilich v. Commissioner.
Zibilich v. Commissioner
Docket No. 4747-70.
United States Tax Court
T.C. Memo 1972-92; 1972 Tax Ct. Memo LEXIS 166; 31 T.C.M. (CCH) 365; T.C.M. (RIA) 72092; April 24, 1972, Filed. Robert L. Beery and Gregg M. Anderson, 235 Montgomery, San Francisco, Calif., for the petitioners. Lawrence G. Becker, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to the tax under section 6653(a) [1] as follows: Year
Deficiency
Addition to Tax
1966
$981.38
$49.06
1967
858.23
42.91
1968
769.40
38.47
In an amended answer, respondent alleged that he understated the deficiencies and addition to tax and that the correct amounts thereof are *167 as follows: Year
Deficiency
Addition to Tax
1966
$997.03
$49.85
1967
911.56
45.58
1968
872.05
43.60 The issues to be decided are as follows: 1. Whether petitioner August M. Zibilich, a waiter, understated his income from tips in his income tax returns for 1966, 1967, and 1968; and 2. Whether any part of petitioners' underpayment of tax for 1966, 1967, and 1968 was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). Findings of Fact At the time they filed their petition, August M. and Elizabeth Zibilich, husband and wife, were legal residents of Mill Valley, California. They filed joint income tax returns for 1966, 1967, and 1968 with the district director of internal revenue, San Francisco, California. For convenience, August M. Zibilich will hereinafter be referred to as "petitioner." During 1966, 1967, and 1968, petitioner was employed as a waiter at Tadich Grill (sometimes hereinafter referred to as "the 366 Grill"), a restaurant located *168 in downtown San Francisco. He began working at Tadich Grill in 1960, having previously worked at a similar restaurant. Tadich Grill, established in 1849, is the oldest restaurant in California in terms of continuous operation. In 1912 it opened a place of business at 545 Clay Street, located for many years in a business area of San Francisco. By 1966 and 1967 this area had been affected substantially by the San Francisco redevelopment program and was then on the fringe of the financial district. On July 15, 1967, Tadich Grill closed its restaurant at the Clay Street location and, on August 21, 1967, opened a new one at 240 California Street, a location near the banks, insurance companies, stockbrokerage firms, and other establishments in the financial district of the city. Most of Tadich Grill's customers are business and professional people who work in the financial district of San Francisco. It has very little tourist trade and does not advertise extensively. It serves lunches and dinners, specializing in seafood. During 1966, 1967, and 1968, the price of the entrees on its menus of some 60 items ranged from $2 to $6; the average price of meals, including wine and liquor, was *169 $5.40 per person. Tadich Grill is not a restaurant for leisure dining. It does not cater to customers interested in lingering over their meals. It is a busy restaurant. Seventy percent of its business is derived from repeatent customers - people who return on a daily, weekly, or monthly basis. Few children, unescorted by adults, and few family groups dine at the Grill. The tables at Tadich Grill are divided into groups called stations, and a waiter is assigned to each station. At the Clay Street location, there were five stations, and at the California Street location, there are seven stations. From the standpoint of the waiters and most of the customers, the preferred stations are near the center of the restaurant - neither too close to the front door nor too close to the kitchen. The maitre d' distributes the customers among the tables located in the several stations, but many individuals, particularly regular customers, request to be seated in the preferred stations. During the period in controversy, petitioner was regarded as a very competent waiter. He had acquired a reputation for giving prompt and efficient service. On a scale of fair, good, and prime, his station at the *170 Clay Street location was good and at the California Street location was prime. A waiter with a good or prime station earned larger amounts in tips than one who served a less desirable station. Petitioner had certain regular customers who requested to be seated at his station, and this tended to add to his earnings. At Tadich Grill, the practice was for the waiter to collect from the customer and take the check and the cash to the cashier. As a general rule, this system produced larger tips for waiters than one in which the customer paid the cashier and left his tip on the table. However, with the exception of about 10 house accounts, the Grill did not permit credit sales, and tips received on cash sales tend to be lower than those received on credit sales. Tipping in San Francisco restaurants during the years in question varied between 10 percent and 15 percent of the bill. The tips received by the waiters at Tadich Grill, including petitioner, were equal to approximately 10 percent of their sales of food and liquor. At the Clay Street location, each waiter paid one busboy $2.50 per day from his tips. At the California Street location, each waiter paid each of two busboys $2.50 *171 per day from his tips or a total of $5 per day. Each waiter also occasionally bought cigarettes and drinks for the cooks and the bartenders. The sales of food, liquor, and wine by the waiters at Tadich Grill were as follows: 1966
1967
1968
Waiters' food sales
$489,707.18
$534,342.13
$679,885.53
Waiters' liquor sales 37,181.55
66,840.81
117,302.16
Total sales
$526,888.73
$601,182.94
$797,187.69
The following table reflects (1) the total amounts of the wages paid the waiters at Tadich Grill; (2) the amounts of the wages received by petitioner under his union contract with Tadich Grill; (3) the amounts of tips reported by petitioner as income in his joint income tax returns; (4) the amounts of tips determined by respondent 367 to have been received and not reported by petitioner; and (5) the amounts of tips alleged in respondent's amended answer to have been received and not reported by petitioner: 1966
1967
1968
(1) Total waiters' wages
$25,539.90
$27,499.28
$40,866.44
(2) Wages paid petitioner
3,998.60
4,003.12
4,547.49
(3) Tips reported
1,716.70
2,736.30
3,604.35
(4) Unreported tips determined
5,320.84
4,629.54
3,717.11
(5) Unreported tips alleged in amended answer
5,400.80
[1] 4,909.66
4,217.33
*172 During 1966, 1967, and 1968, petitioner supported his family which included two children - a son and a daughter, 15 and 18 years old, respectively, during 1966. His son was in high school during that period, and his daughter was attending the College of Marin. Petitioner owned his own home on which he made mortgage payments of about $1,500 per year. His annual utility bills for this house were approximately $420. He also participated in a stock purchase program in which he invested about $160 per year. His commuting costs between his home in Mill Valley and San Francisco were at least $100 per year. Late in 1966, petitioner purchased a new automobile for which he made monthly payments of $86.36; these payments, at an annual rate of $1,036.32, continued through 1968. Also during 1967 and 1968, he made payments of $600 per year on a second automobile. Insurance for these automobiles cost $300 per year. All the operating *173 costs for these automobiles, which were driven a total of about 15,000 miles per year, were paid by petitioner. During March 1967, petitioner borrowed $5,500 to remodel the kitchen in his house; he repaid this loan at the rate of $60 per month. Other amounts which petitioner expended for which he claimed deductions for 1966, 1967, and 1968 totaled $713.65, $644, and $733, respectively; these amounts were spent for such items as medical care, taxes, union dues, and charitable contributions. Ultimate Findings of Fact Petitioner received income from tips and gratuities which he failed to report in his returns for 1966, 1967, and 1968 in the following amounts: 1966
$5,400.80
1967
4,909.66
1968
4,217.33
Opinion To support the correctness of the amounts of tip income reported for 1966, 1967, and 1968, petitioner relies upon a "Daily Record of Tips" purportedly maintained for those years. However, we do not think these records are accurate. The amounts of tip income reflected therein do not coincide precisely with the amounts reported in petitioner's returns, [2] and the daily entries are in consistently even amounts which are frequently repeated. Moreover, the *174 evidence convincingly shows that the records do not reflect all of petitioner's tip income. 1966
1967
1968
The amounts reported as tip income approximate only 3 percent to 5 percent of the sales price of food and liquor served by petitioner, whereas the maitre d' and owner of Tadich Grill testified that the tips left by customers amounted to an average of 10 percent of sales. His testimony was based on personal observation, as well as his negotiations with the Waiters' Union, and is supported by that of a restaurant editor of a widely read San Francisco magazine who is familiar with the tipping habits in local restaurants, including Tadich Grill. And we do not think that the gross income reported by petitioner during those years would support the standard of living which he apparently enjoyed. In the light of all the evidence, we must hold that petitioner failed to report a substantial part of his tip income. In these circumstances, respondent is authorized by section 446 to recompute petitioner's tip receipts, employing a method *175 which in his opinion clearly reflects income. See Barry Meneguzzo, 43 T.C. 824, 831 (1965); Dorothy L. Sutherland, 32 T.C. 862, 866 (1959). The question remaining is whether the method which respondent employed produced an accurate determination. 368 Under the method which he employed, respondent for each year: (1) determined the total amounts of the Grill's sales of food and liquor; (2) subtracted the bar sales not subject to tips; (3) arrived in this manner at the net sales of food and liquor served by the waiters; (4) estimated the total tips at 10 percent of net sales; (5) subtracted the amounts paid by the waiters to the busboys and other restaurant personnel; (6) arrived in this manner at the total tips retained by the waiters; (7) ascertained the total salaries paid to the waiters; (8) arrived at the ratio of the tips to the total salaries; (9) applied that ratio to petitioner's salary in computing his tip income; and (10) subtracted from petitioner's total tip income so computed the amounts reported in his income tax returns from this source. Petitioner has not shown that this method is an unreasonable one. [3]
*176 In the light of the evidence presented at the trial, respondent contends that petitioner has an unpaid tax liability in excess of that determined in the notice of deficiency. The evidence shows that in computing petitioner's deficiencies for purposes of issuing the notice of deficiency, the revenue agent erroneously subtracted from total sales the total amount of the liquor sales appearing on the waiters' tickets instead of subtracting the smaller amount of the bar sales. This error resulted in an understatement of the net sales of food and liquor served by all the waiters and, consequently, by petitioner. The amounts of the deficiencies claimed by respondent in his amended answer reflect the correction of this error. We think that respondent has carried his burden of showing that the deficiencies in petitioner's income tax are the larger amounts claimed in the amended answer. As shown by our Findings, there are wide discrepancies between the amounts of tip income reported by petitioner and the amounts of such income determined by respondent and sustained herein. While respondent might have determined that the apparently deliberate falsification of petitioner's "Daily Record of *177 Tips" amounts to fraud within the meaning of section 6653(b), [4] he has not done so, and we are not required to pass on such a determination. See Nazzareno D. Cesanelli, 8 T.C. 776, 780 (1947). However, petitioner gave no satisfactory explanation of the discrepancies, and even viewing the evidence most favorably to him we think his underpayment of tax, at a minimum, was due to "negligence or intentional disregard of [respondent's] rules and regulations" within the meaning of section 6653 (a); we refer to the statutes and regulations requiring petitioner to keep such records as "are sufficient to establish the amount of gross income * * * required to be shown * * * in any return." Sec. 1.6001-1(a), Income Tax Regs. We conclude that the additions to tax determined by respondent pursuant to section 6653(a) are applicable. Marcello v. Commissioner, 380 F. 2d 499, 505 (C.A. 5, 1967), affirming on this issue a Memorandum Opinion of this Court. *178 Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
1. Respondent's computations show that $4,909.76 rather than $4,909.66 of petitioner's income from tips was not reported by him. In making these computations, respondent erred in subtracting only $2,736.20 of the $2,736.30 of tip income reported by petitioner.↩
2. Amounts shown in records $2,069.55 $2,988.20 $3,587.90 Amounts reported in tax returns 1,716.70 2,736.30 3,604.35 ↩
3. The method of tip income computation used by respondent in the present case is the same as the method approved in Louis Lerner, T.C. Memo. 1965-267; cf. Barry Meneguzzo, 43 T.C. 824, 833↩ (1965).
4. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *↩