BARRY MENEGUZZO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 470–63. Filed March 18, 1965.

*J. Arthur McNamara*, for the petitioners.

*Frederic S. Kramer, Kennard L. Mandell, Lee S. Kamp, Michael D. Weinberg*, and *Marie L. Garibaldi*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's income tax and additions to tax as follows:

| Year | Income tax | Additions to tax, sec. 6653(a), I.R.C. 1954 |
|------|------------|----------------------------------------------|
| 1957 | $559.90 | $27.99 |
| 1958 | 559.28 | 27.87 |
| 1959 | 386.35 | 19.32 |

The primary issue for decision is whether petitioner, a waiter, understated his income from tips. A second issue is whether respondent properly determined additions to tax under section 6653(a).[1]

We have decided to consider the second issue even though it may not, technically, be presented by the pleadings. Rule 7(c)(4)(B) 4 and 5, Tax Court Rules of Practice, requires "Clear and concise assignments of each and every error" alleged to have been committed by respondent as well as "Clear and concise lettered statements of the facts upon which the petitioner relies as sustaining the assignments of error." Neither the assignments of error nor the statements of facts relied upon in the petition in this case can be construed as putting in issue respondent's assertion of the negligence penalty of section 6653(a) as a matter separate from the existence *vel non* of a deficiency. Nevertheless, considering that the issue is not a complex one and that respondent was clearly prepared to try the question, we deem it advisable to decide the issue on its merits. See *Erwin Gerber*, 32 T.C. 1199 (1959).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner filed his individual Federal income tax returns for the years 1957–59 with the district director of internal revenue for the district of Manhattan, New York City, N.Y. During the taxable years petitioner worked as a waiter as Whyte's Restaurant, 145 Fulton Street, Whyte's Restaurant, 344 West 57th Street, both in New York City, and also at Recineway Restaurant, Bronx, N.Y.

### Findings Regarding Whyte's Restaurants

During the years in issue, Whyte's Restaurant, 145 Fulton Street, New York City (hereinafter referred to as Whyte's downtown),[2] was a good-quality restaurant in the Wall Street area, patronized by business and professional people. It was open Monday through Friday, except holidays, from 11:30 a.m. to 8:30 p.m. The average food and beverage charge at Whyte's downtown was $4–$5 per person.

[1] Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as applicable during 1957–59.

[2] This terminology is necessary to distinguish Whyte's downtown from a second Whyte's Restaurant, which is located at 344 West 57th St., New York City. The latter is known as Whyte's uptown.

There are two floors and a basement in Whyte's downtown, containing four rooms for serving patrons. The upstairs dining room, also known as the ladies' dining room, can seat 200 persons. In the evenings it was used only for banquets. The main dining room, near the Fulton Street entrance, and the cafe, located near the Ann Street entrance and adjacent to a standup bar, had a combined seating capacity of 375. The Beefeater's Room, in the basement, could seat 75 persons; this room was used only for parties.

During the years in question Whyte's downtown employed 35 waiters, of whom 14 had stations in the upstairs dining room, 15 in the main dining room, and 6 in the cafe. Most of the waiters had regular stations, which were allotted primarily on the basis of seniority. There was no rotation of stations. In each room there were union delegates who in addition to their waiting duties kept daily and weekly records of the number of customers served by each waiter. The purpose of this practice was to ensure that the headwaiters allotted an equal number of customers to each waiter.

Whyte's was busiest at lunchtime, between the hours of 12 and 2 p.m. For lunch, the waiters arrived at 11 a.m. and worked until about 2:30 p.m. Working hours for dinner were approximately from 5 p.m. to 8:30 p.m. Before serving, the waiters had to clean up and get their stations in order. Besides taking and filling orders for food, the waiters also took and filled orders for liquor served at their tables. This required a trip to the service bar, which was at one end of the standup bar on the main floor. The waiters carried their own trays; however, the tables were cleared and set by busboys, who also served the bread and butter.

The work in the cafe was somewhat different from that in the rest of the restaurant. No women were allowed in the cafe until after 2 p.m. Many luncheon patrons would have a drink or two at the standup bar before sitting down to lunch. Frequently, upon leaving the bar, charge account customers would take a drink to the table or tell the bartender to send another drink to the table. Under these circumstances, the price of the drinks might be added to the food checks even though the sales were not properly attributable to any waiter. The customers would generally disregard the cost of drinks added in this manner when computing the tip for the table waiter, since they normally tipped the bartender for serving those drinks. In the evenings there were relatively few dinners served in the cafe. Many customers came in only for cocktails. Others took advantage of a free buffet that was set up nightly in the cafe for persons buying drinks. The waiters in the cafe pooled their tips in the evening. Monday and Tuesday evenings there were three waiters in the cafe; Wednesday through Friday there were four.

In 1957–59, waiters at Whyte's downtown received wages of approximately $18–$21 per week or $3.60–$4.20 per day for working only lunches, and $33–$37 per week or $6.60–$7.40 per day for working both lunch and dinner.[3]   Each waiter was entitled to, and required to take, 2 (or 3) weeks' vacation with pay each year.[4]   The waiters were required to wear uniforms, consisting of black dinner jacket and accessories, while on duty.   They owned and maintained their own uniforms, which were not suitable for street wear.   Most, if not all, of the waiters belonged to the union and paid monthly dues of $4.75. Busboys regularly received 15 percent of the waiters' tips, and perhaps a bit more if the waiters' tips were unusually low.

Whyte's downtown handled a large amount of banquet business. Before Christmas, there frequently were banquets in every room in the restaurant 5 nights per week.   Luncheon banquets were less frequent.   During an average nonsummer month, banquets accounted for a significant percentage of dinner and about 10 percent of luncheon customers.   In December the dinner percentage of banquets was high, reaching about 60 percent; during the summer it was lower. Overall, banquet business made up about 20 percent of the dollar volume at Whyte's downtown.

Banquet parties ranged in size from 20 to 200 persons, with the majority exceeding 40 persons.   For each banquet, the courses to be served were planned in advance, and a fixed charge per person was set.   The amount of such charge was determined by a number of factors, such as the type of food served, whether the charge included tips, and whether the charge included liquor.   The banquet charge per person sometimes included tips; when this was done, tips averaged 10 to 15 percent of the base price for the food.   At other times, a percentage, usually 10 to 15 percent, was added to the bill for tips.   Sometimes the waiters were permitted to take up a collection.   The records of Whyte's downtown did not distinguish between banquet and regular sales.

The portion of banquet tips allotted to the waiters for a banquet depended upon the type of banquet and the amounts, if any, given to the chef, bartenders, or captain.   The amount of tips actually received by a given waiter also depended upon the number of waiters who worked the banquet, since banquet waiters pool tips.   If the banquet charge did not include liquor, customers sometimes tipped the waiters on drinks served at the table.   As usual, the busboys received part of the waiters' tips.   In addition to tips, banquet waiters were also paid a salary.   At some banquets there was a "cash bar" set up in the ban-

---

[3] The record does not contain the information necessary for a more precise determination.
[4] The evidence is conflicting as to the length of the vacation during the years in question; resolution of the conflict is not necessary to our decision.

quet room for the convenience of those customers who wanted to drink without going to the regular bar. This was more frequent when the banquet was not on the main floor.

During the years in question, there was demolition and construction work being carried on next door to Whyte's downtown. On one occasion a wrecking ball broke open a wall on the main floor. Although this construction, with its noise and dirt and sidewalk obstructions, may have affected the volume of business at Whyte's downtown, it did not affect the tipping habits of those who did patronize the restaurant.

Approximately one-half of the dollar volume of business at Whyte's downtown was accounted for by customers who had charge accounts. Many such customers preferred to add tips to the checks rather than to tip in cash. Tips might be added either as a percentage of the cost of food and beverages or as an amount in dollars and cents. In either case, the waiter was paid his tip in cash by the cashier when the waiter presented the check for totaling. Guest checks at Whyte's downtown did not disclose the waiter who served the meal being billed. In any event, guest checks for 1957–59 are not available.

On two occasions in 1961, respondent's agents made investigations of the tipping habits of charge account customers at Whyte's downtown. On May 31, 1961, the average tip left by charge account customers who added tips to the check was 19.45 percent of the food and beverage charge. On June 6, 1961, the percentage was 18.18. Such records for 1957–59 were not available. Tipping habits of customers of Whyte's downtown did not change materially between 1957–59 and 1961.

Respondent determined that a large number of the waiters at Whyte's downtown had understated their tip income for the calendar years 1957–59 on their Federal income tax returns. Since many, if not all, of these waiters kept no records or inadequate records of tip income, respondent used a formula to determine the amount of tip income received by each waiter. The formula established, for all waiters, a relationship between salary received and tips received.

Respondent's formula was derived in the following manner: Total bar sales for each of the years 1957, 1958, and 1959 were found from the books and records at Whyte's downtown. It is stipulated that 25 percent of these totals represented the standup portion of bar sales; consequently, such percentage was then subtracted to get total bar sales at tables, on which the waiters received tips. Total food sales for each year were added to table sales of liquor to produce total table sales of food and liquor, in dollars.

The next step was to determine what percentage of his food and beverage bill the average customer at Whyte's downtown left as a

tip.   In addition to the aforementioned spot checks of the tipping habits of charge account customers, respondent utilized information gathered from talks with supervisory personnel of Whyte's and comparable restaurants, as well as information accumulated as a result of many similar cases, in determining that an average tip of 15 percent was both fair and accurate.   Respondent consequently determined that 15 percent of total table sales represented the total amount of tips left by customers of Whyte's downtown in each of the years 1957–59. From this amount, 15 percent was subtracted to allow for the waiters' tips to the busboys; the remainder represented total tips received by the waiters.   When totals of salaries paid to the waiters in each year in question were taken from the payroll cards of Whyte's downtown, it was possible to establish a ratio of total tips to total waiters' wages.

The results of respondent's computations are summarized in the following table:

| | Totals | 1957 | 1958 | 1959 |
|---|---|---|---|---|
| Sales of beverages | $792,054.90 | $259,894.30 | $265,107.11 | $267,053.49 |
| Less—25 percent sold at bar | 198,013.73 | 64,973.58 | 66,276.78 | 66,763.37 |
| Beverage sales at tables | 594,041.17 | 194,920.72 | 198,830.33 | 200,290.12 |
| Food sales | 1,742,385.28 | 588,800.60 | 584,375.63 | 569,209.05 |
| Total sales at tables | 2,336,426.45 | 783,721.32 | 783,205.96 | 769,499.17 |
| Tips at 15 percent | 350,463.97 | 117,558.20 | 117,480.89 | 115,424.88 |
| Less—15 percent to busboys | 52,569.59 | 17,633.73 | 17,622.13 | 17,313.73 |
| Net taxable tips | 297,894.38 | 99,924.47 | 99,858.76 | 98,111.15 |
| Total wages—per payroll cards | 127,261.93 | 41,572.21 | 44,164.95 | 41,514.77 |
| Effective ratio of taxable tips to wages | 2.34 | 2.40 | 2.26 | 2.36 |

In determining the amount of tip income received by individual waiters at Whyte's downtown, respondent applied a ratio of tips per dollar of salary to the salary of the particular waiter.   However, respondent did not apply the ratios derived from the above table strictly.   Recognizing that there might be variations in tip income caused by differences in stations, efficiency, and the like, respondent reduced those ratios to an even 2.00, i.e., $2 of tips for every $1 of wages. No further adjustments were made to the formula.   Respondent's formula was meant to apply only to Whyte's downtown.

Whyte's uptown is, and was, situated at 344 West 57th Street, New York City, not far from the New York Coliseum.   Its ownership and management are the same as those of Whyte's downtown.   Whyte's uptown catered more to the tourist and theater trade than did Whyte's downtown.   Patrons of Whyte's uptown tipped less generously than did those of Whyte's downtown.

It frequently happened that additional waiters were needed to serve dinner at Whyte's uptown.   On such occasions, it was the practice of the management to fill such need with Whyte's downtown

waiters who either did not regularly work dinners or who were not needed for the particular evening involved. The waiters who worked at Whyte's uptown in this irregular fashion received their salaries for such work through Whyte's downtown. They did not receive separate records indicating the amount of salary earned at Whyte's uptown, nor did they report such salary separately on their Federal income tax returns. There was a union representative at Whyte's uptown who tried to assure an equal distribution of customers among the waiters.

### Other Findings

Petitioner began working at Whyte's downtown in 1956. He regularly worked five lunches per week. Until the middle of 1958 he had a station, consisting of four tables of two chairs each, in the main dining room near the Fulton Street entrance. Subsequently, petitioner was transferred to a station having 12 chairs. In 1958 and 1959 petitioner worked one or two dinners per week; in 1957 he worked dinners less frequently. Petitioner also worked some banquets at Whyte's downtown, and occasionally worked dinners at Whyte's uptown. Petitioner received no salary from Whyte's uptown, but was paid for his work there by Whyte's downtown.

For 3 months in 1957 petitioner, in addition to his waiter's chores at Whyte's downtown, worked the so-called telephone watch. This work consisted of answering the telephone, receiving deliveries, and doing odd jobs before the restaurant opened, between the hours of 8 and 11 a.m. each day. Petitioner was paid $2 per day, or $10 per week for this extra work; petitioner received $125 for this work in 1957.

Petitioner also worked at Recineway Restaurant during the years in issue. Recineway is and was a catering house. The waiters received no tips in addition to the salary paid them by the management. Petitioner received no income during the taxable years from his work at Recineway other than the amounts reported on his Federal income tax returns.

Petitioner failed to keep records from which his income from tips earned at Whyte's restaurants could be determined. Respondent's actions in applying a formula to determine the tip income earned by petitioner at Whyte's downtown were reasonable.

Petitioner reported income from tips of $1,000, $1,250, and $1,840 for the respective years 1957, 1958, and 1959. Respondent determined that petitioner had understated his tip income in each of the taxable years. Respondent's determination of the amount of the understatement was arrived at by attributing to petitioner for each of the years in question tips from Whyte's restaurants equal to twice his wages from Whyte's and tips from Recineway equal to his wages from that employer. Petitioner's reported tip income was subtracted from the

sum of the amounts so determined to arrive at the amount of the asserted understatement of tip income.

Respondent further determined that petitioner had failed to report income from interest on savings bank deposits. This issue is not contested.

Respondent also asserted the 5-percent addition to tax under section 6653(a), the so-called negligence penalty.

### OPINION

This is one of a group of cases brought by waiters at Whyte's downtown to contest deficiencies in income tax asserted against them by respondent. It has been stipulated in each of such cases that certain evidence shall be considered in all of them.

The primary issue in this case (and in each case of the group) concerns the correctness of respondent's use of a formula to determine understatements of tip income earned at Whyte's downtown.

Tips are, of course, includable in gross income under section 61(a). *Carroll F. Schroeder*, 40 T.C. 30 (1963); *Harry A. Roberts*, 10 T.C. 581 (1948), affd. 176 F. 2d 221 (C.A. 9, 1949). Taxpayers are required by section 6001 [5] to keep such records as may be required by the Secretary of the Treasury or his delegate. If a taxpayer fails to keep the required records, or the records kept do not clearly reflect income, respondent is authorized by section 446 [6] to compute income in accordance with such method as in his opinion does clearly reflect income. *Dorothy L. Sutherland*, 32 T.C. 862 (1959).

It is respondent's position that section 1.6001-1, Income Tax Regs.,[7] required petitioner to keep such records as would establish the amount of his tip income. Respondent relies upon *Mendelson* v. *Commissioner*,

---

[5] SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS.

Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate may from time to time prescribe. * * *

[6] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

[7] Sec. 1.6001-1 Records.

(a) *In general.* Except as provided in paragraph (b) of this section, any person subject to tax under subtitle A of the Code, or any person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.

(b) *Farmers and wage-earners.* Individuals deriving gross income from the business of farming, and individuals whose gross income includes salaries, wages, or similar compensation for personal services rendered, are required with respect to such income to keep such records as will enable the district director to determine the correct amount of income subject to the tax. It is not necessary, however, that with respect to such income individuals keep the books of account or records required by paragraph (a) of this section. * * *

305 F. 2d 519 (C.A. 7, 1962), affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 877 (1962), and upon *Anson* v. *Commissioner*, 328 F. 2d 703 (C.A. 10, 1964), affirming a Memorandum Opinion of this Court.

Petitioner argues that the controlling regulation is section 39.54–1 (a), Regs. 118,[8] which grants to "persons whose gross income (1) consists solely of salary, wages, or similar compensation for personal services rendered" an exemption from the recordkeeping requirements applicable to taxpayers in general. In urging that recipients of tip income fall within the exemption so granted, petitioner refers us to section 39.22(a)–2(a), Regs. 118, which provides:

> *Compensation for personal services.* (a) Commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, pay of persons in the military or naval forces of the United States, retired pay of Federal and other officers, and pensions or retiring allowances paid by the United States (unless expressly exempt) or by private persons are income to the recipients; * * *

Petitioner, although he also argues that section 1.6001–1(b), Income Tax Regs., continues his asserted exemption from recordkeeping, apparently would have us give no effect to the provision in T.D. 6364, 24 Fed. Reg. 1178, 1179 (1959), purporting to apply section 1.6001–1(b) to all taxable years governed by the 1954 Code.

Petitioner's argument must be rejected. We do not believe that section 39.54–1(a), Regs. 118, was intended to relieve wage earners and farmers of all recordkeeping duties. Such an interpretation would be wholly inconsistent with the efficient functioning of our income tax system, which is based upon initial self-assessment. If the rule were as urged by petitioner, it would, in most cases, be exceedingly difficult for respondent to determine whether a taxpayer had accurately reported income. We hold that the proper interpretation of section 39.54–1(a), Regs. 118, is found in section 1.6001–1 (a) and (b). In other words, wage earners and farmers need not keep the formal records and books of account required of other taxpayers. They must, however, keep such records as will enable respondent to determine taxable income.

Our interpretation of the regulations is consistent with the cases dealing with the issue of the necessity for recordkeeping by persons receiving tip income. *Anson* v. *Commissioner*, *supra* (taxable year

---

[8] Sec. 39.54–1. *Records and income tax forms.* (a) Every person subject to the tax, except persons whose gross income (1) consists solely of salary, wages, or similar compensation for personal services rendered, or (2) arises solely from the business of growing and selling products of the soil, shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of the gross income and the deductions, credits, and other matters required to be shown in any return under chapter 1. * * *

1958); *Mendelson* v. *Commissioner*, *supra* (taxable years 1957–58); *Carroll F. Schroeder*, *supra* (taxable years 1957–58); *Dorothy L. Sutherland*, *supra* (taxable years 1953–55). It is to be noted that all of the above-cited cases involved taxable periods prior to the final adoption of section 1.6001–1 (a) and (b), Income Tax Regs.

In view of our interpretation of section 39.54–1(a), Regs. 118, we need not consider whether retroactive application of section 1.6001–1 (a) and (b), would be proper, or whether, even if section 39.54–1(a) wholly exempted wage earners from the need to keep any records, recipients of tip income would be within the exemption.

We have found as a fact that petitioner failed to keep records from which his tip income from Whyte's restaurants could be determined. Although petitioner claimed that at least in 1958 and 1959 he kept approximate records of his tips on a weekly basis, his testimony was somewhat vague, partially contradictory, and wholly uncorroborated. He gave no satisfactory explanation for his inability to produce such records. Furthermore, it is not at all clear that such weekly estimates would satisfy the requirements of the regulations. Under these circumstances, respondent was justified, in view of the authority granted him by section 446(b), in utilizing a method for estimating petitioner's tip income. *Anson* v. *Commissioner*, *supra*.

Under respondent's formula for Whyte's downtown, total tips paid to all waiters were first determined for each year as 15 percent of table sales. The amount so found was reduced 15 percent for tips paid to busboys. The remainder, representing tips retained by waiters, was then compared with total annual wages paid to waiters by Whyte's downtown, and ratios of tips per dollar of wages were determined for each of the years 1957–59. These ratios, 2.40, 2.26, and 2.36, for 1957, 1958, and 1959, respectively, were then reduced to 2.00 for each year to allow for individual variations among the waiters. In effect, this reduced the percentage of tips received by each waiter on his proportionate part of sales, after payments to busboys, to approximately 10.6 in 1957, 11.3 in 1958, and 10.8 in 1959. These percentages are, in turn, equivalent to tips left by customers (before shares to busboys) of 12.5 percent of total sales in 1957, 13.3 percent in 1958, and 12.7 percent in 1959. We believe that these adjustments amply allowed for any such factors as lack of seniority, language difficulty, or inferior stations, which factors might have resulted in petitioner's tips-to-wages ratio being less than the average ratios initially determined by respondent.

In view of the evidence presented by respondent supporting the initial 15-percent figure, these percentages seem entirely fair to petitioner. Petitioner's self-serving testimony that his customers left tips

of 8–11 percent is not sufficient to sustain his burden of proof, or to rebut respondent's evidence.

For us to sustain respondent's use of the formula as rational, it must appear that each waiter's share of total waiters' tips was approximately proportionate to his share of total waiters' wages. We are convinced that such was in fact the case. In each room of Whyte's downtown there was a union representative whose task it was to assure that each waiter was given approximately an equal number of customers. Thus, during the time any given waiter worked, he would have received a proportionate share of the tips left by customers during that time. Apparently, wages at Whyte's were not completely proportional to hours worked. For working lunch and dinner on the same day, a waiter would receive wages of about $7. For working only at lunchtime, he would receive about $4. If tips per waiter at lunch and dinner were uniform, waiters who worked only or primarily at lunch would, under the formula, be allocated more than their proper share of tips. However, the evidence established that lunch was the busiest period at Whyte's downtown and that a waiter received less in tips working dinner than lunch. Furthermore, of the waiters to whom the formula was applied, all who worked at dinner also worked full time at lunch; thus, those who worked at dinner were not allocated too large a share of the tips, as would have been true had any waiter worked only at dinner for wages of $4 per day. On the whole, use of the formula resulted in an approximately accurate allocation of tips. That is all that is required. *Anson* v. *Commissioner*, *supra*; *Mendelson* v. *Commissioner*, *supra*; *Carroll F. Schroeder*, *supra*.

Respondent's determination of petitioner's tip income is presumptively correct, and petitioner has the burden of proving it erroneous. *Welch* v. *Helvering*, 290 U.S. 111 (1933) ; *Anson* v. *Commissioner*, *supra*; *Dorothy L. Sutherland*, *supra*. Petitioner attempts to meet this burden by asserting that respondent's formula was arbitrary and erroneous because it was not adjusted to take proper account of banquet sales and tips, vacation pay, or sales at "cash bars" at banquets.

Petitioner has failed to prove that any adjustment was required for banquet sales and tips. He has failed to establish that net tips paid to banquet waiters were less than 11.3 percent in any year; he has failed to show that individual waiters received less than $2 in banquet tips for each $1 of banquet wages; he has not shown that banquet tips were included in total table sales in instances when the banquet fee included tips nor has petitioner even shown that any adjustment that might have been required would not have been covered by respondent's downward revision of the tips-to-wages ratios. In short, petitioner has failed to prove any error resulted in the formula from respondent's failure to make express adjustment for banquet sales and tips.

Petitioner claims that failure to adjust the formula for vacation pay resulted in petitioner being allocated tips for a period in which he did not work. Petitioner misconceives the workings of the formula. The record shows that all waiters were required to take a vacation in each year and that the length of such vacation—whether it was 2 weeks or 3 weeks is not clearly established—was the same for each waiter. It is reasonable to assume—and petitioner has not attempted to prove otherwise—that each waiter's vacation pay was proportional to his average weekly salary and, accordingly, to his annual salary. Deducting proportional amounts from each waiter's annual salary would not change the amount of tips allocated to each waiter. It follows that petitioner has not shown that he has been prejudiced.

Petitioner has not proven that any adjustment to the formula is required to take account of liquor sales made at "cash bars" at banquets. Even if we were convinced that some adjustment were necessary, the record is devoid of evidence on which to base such an adjustment. We know only that there were some such sales. We have no evidence of the amount of such sales, nor even evidence that banquet waiters did not share in any tips attributable to such sales.

Petitioner has not established the invalidity of respondent's formula. He has, however, shown that in two respects it was erroneously applied to him. Petitioner worked at the telephone watch at Whyte's downtown for 3 months in 1957. For this work, which consisted of answering the telephone and doing odd jobs each morning before the restaurant opened, petitioner received $2 per day, $125 in all. Since petitioner received no tips in connection with this extra duty, respondent erred in attributing to petitioner $2 of tips for each $1 of wages so earned. Accordingly, petitioner's tip income for 1957 should be reduced $250 below the amount determined by respondent.

Respondent's witness stated that the formula described in our Findings of Fact was valid only for Whyte's downtown. Respondent made no attempt to establish that the same formula applied to Whyte's uptown. Petitioner occasionally worked dinners at Whyte's uptown; his wages for such work were paid by Whyte's downtown. We hold it was error for respondent to use his formula to determine petitioner's tip income earned at Whyte's uptown.

The record does not disclose how often petitioner worked at Whyte's uptown or how much he received as tips in connection with such work. The record does establish that the patrons of Whyte's uptown disbursed gratuities less generously than those of Whyte's downtown. Since we are satisfied that some adjustment is necessary, we have no alternative but to make an estimate, based upon available information, weighing doubts against the petitioner, who has the burden of proof. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). Accordingly, we hold that respondent's determination of petitioner's tip income

should be reduced by $40 for each of the years 1957, 1958, and 1959, on this account.

Since petitioner earned no tips at Recineway in addition to the salary paid him there, respondent erred in adding to petitioner's income for each year an amount equal to such salary.

Petitioner understated his income for each of the taxable years. In view of his failure to keep adequate records, petitioner was extremely negligent; since this negligence resulted in an underpayment, the additions to tax determined by respondent under section 6653(a) [9] must be sustained. *Carroll F. Schroeder, supra.* See *Mendelson* v. *Commissioner, supra.*

Petitioner argues that respondent's acceptance of petitioner's returns for years prior to 1957 bars respondent from now determining deficiencies and from asserting negligence penalties. This argument is wholly without merit. See, e.g., *Caldwell* v. *Commissioner*, 202 F. 2d 112, 115 (C.A. 2, 1953).

*Decision will be entered under Rule 50.*

---

[9] SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)·(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.