ROBERT J. MORGAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morgan v. Commissioner
Docket No. 5056-78.
United States Tax Court
T.C. Memo 1980-499; 1980 Tax Ct. Memo LEXIS 88; 41 T.C.M. (CCH) 332; T.C.M. (RIA) 80499; November 5, 1980, Filed Robert J. Morgan, pro se. Cynthia J. Olson, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in the petitioner's Federal income taxes and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(a) [1]
1974
$1,082.00
$54.00
1975
1,923.98
96.20
*89 The issues for decision are (1) whether the petitioner understated his tip income for the years 1974 and 1975 and (2) whether he is liable for the additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Robert J. Morgan (petitioner) was a legal resident of Las Vegas, Nevada, when he filed his petition in this case. During 1974 and 1975 petitioner was employed as a fulltime waiter in the Celebrity Room of the MGM Grand Hotel (hereinafter referred to as MGM or the employer) in Las Vegas, Nevada. He had experience as a waiter prior to his employment with MGM. For the years 1974 and 1975 the petitioner's paid hours (excluding vacation and sick leave but including the overtime hours he actually worked) relative to his work as a waiter were: 1974
1975
1,030
1,460
While employed as a Celebrity Room waiter, petitioner received tips from his customers in cash, by credit card sales, *90 room charges and coupon sales. None of these tips were included on the Forms W-2 provided to the petitioner unless the tips were specifically declared to the employer by him. Petitioner reported tip income on his 1974 and 1975 Federal income tax returns as follows: 1974
Tips Reported
Additional Tips
To Employer
Reported on Return
Total
$1,699.00
$603.00
$2,302.00
1975
$3,493.75
0
$3,493.75
The Celebrity Room showroom is a large room wherein the MGM presents a floor show twice nightly--a dinner show and a cocktail show. During most of 1974 and 1975 the minimum charge for both the dinner and cocktail shows at the Celebrity Room was $17.50. The Celebrity Room is considered a desirable place to work for waiters and waitresses, and the turnover rate was very low during the years 1974 and 1975. The customer seating area in the Celebrity Room is divided into thirty stations. Each of the thirty stations in the Celebrity Room had seats for up to 48 customers. Waiters and waitresses working the dinner show work in two-person teams, with one team serving each station. The stations remain the same at the cocktail show, but they are serviced by only *91 one waiter or waitress. The other waiters and waitresses are scheduled to go home after the dinner show, alternating every night. The Celebrity Room customer attendance during 1974 and 1975 totaled 548,207 and 567,904, respectively. During the years at issue waiters and waitresses were rotated throughout the stations of the Celebrity Room so that each waiter and waitress had an equal opportunity to work all the stations in the room. On nights when petitioner worked the dinner show at the Celebrity Room, the pooled the tips received from that show with his station partner, paid 15 percent of that amount to the busboy, paid a few dollars to the bartender, and split the remainder with his station partner. On nights when petitioner stayed to work the cocktail show at the Celebrity Room, he did not pool the tips received for that show, but gave approximately 15 percent of the tips to the busboy and a few dollars to the bartender. The duties of all Celebrity Room waiters and waitresses include serving the food, collecting the checks, setting up for both shows, and clearing the tables after the shows. Thus, all waiters and waitresses had the same ratio of paid set-up and clean-up *92 time to actual serving time. For the years at issue the Celebrity Room waiters and waitresses were covered by a culinary workers' union contract which provided that they were guaranteed hourly wages for four days per week. When the level of Celebrity Room attendance was down a few stations in upper tiers of the room were closed and the waiters and waitresses assigned to work those stations were released from their schedules shifts. If a waiter or waitress were released without actually having worked a four day week, the waiter or waitress would be paid for the scheduled shift, and the hours for that shift would be reflected in the payroll records as having been worked. The rotation system employed in the Celebrity Room was such that waiters and waitresses worked their first work day of the week in the "pit" (front stations) and rotated each day toward the back stations, so that on their fifth work day they were scheduled to work in the upper tiers of the room. Therefore, the waiters and waitresses who normally were released from work on a slow night were the ones who already had worked a four day week. The Celebrity Room cashier paid out to Celebrity Room waiters and *93 waitresses charged tips and guaranteed tips on coupon sales totaling $438,543.95 in 1974 and $427,729.68 in 1975. Coupon sales in the Celebrity Room represent sales from individual or group tour packages. Gratuities for showroom waiters and waitresses are added to the price of the package, which gratuities during the years at issue were usually equal to 15 percent of the cost of the show, excluding taxes. The paid hours for Celebrity Room waiters and waitresses, excluding vacations and sick leave but including overtime hours only to the extent they represent hours actually worked, totaled 116,784 in 1974 and 117,535 in 1975. The average per hour tips paid out by the Celebrity Room cashier to individual waiters and waitresses, computed by dividing total tips paid out by total waiter-waitress hours, was $3.76 in 1974 and $3.64 in 1975. The Celebrity Room food and beverage sales, including sales tax and cabaret tax, but excluding the excess of minimum charges over actual food and beverage sales, totaled $8,879.393 for 1974 and $10,256,023 for 1975. The Celebrity Room total sales, including sales tax, cabaret tax, and the excess of minimum charges over actual food and beverage *94 sales, were $9,951,478.69 in 1974 and $11,196,125.50 in 1975. The average sale per Celebrity Room customer, determined by dividing the total room sales by the total room attendance, was $18.15 in 1974 and $19.71 in 1975. The average per hour number of patrons served by Celebrity Room waiters and waitresses, determined by dividing total room attendance by total paid hours, was 4.7 in 1974 and 4.8 in 1975. Petitioner served the average number of Celebrity Room customers per work hour. Thus, he served the following number of customers during the years at issue, computed by multiplying the average per hour number of patrons served by his total paid hours: 1974
1975
4,841
7,008
The actual number of customers served would be higher since petitioner worked in a two-person team at the dinner shows. However, since he split the tips received at the dinner show with his station partner, the above figures accurately represent the number of customers from which he could have received tips. Since petitioner served the average number of Celebrity Room customers per work hour, the total sales attributable to customers served by him, computed by multiplying the customers *95 served by the average sale per customer, were as follows: 1974
1975
$87,864.15
$138,127.68
Dividing the total tips reported by petitioner by the Celebrity Room sales attributable to customers served by him results in the following average tip percentages: 1974
1975
2.6%
2.5%
The hourly rate of tips reported by petitioner computed by dividing the total amounts reported by his total paid hours, is as follows: 1974
1975
$2.23
$2.39
In deriving the tip rate applicable to Celebrity Room waiters and waitresses, respondent analyzed Celebrity Room Master Charge sales, American Express sales and sales charged to customers' hotel rooms for 52 days in 1974 and 12 days in 1975. Charge sales which did not include tips were not included in this sample. The charge sales including tips totaled $185,636.06 for the 52 days sampled in 1974 and $47,906.05 for the 12 days sampled in 1975. Tips on these sales totaled $25,960.56 in 1974 and $6,489.56 in 1975, or 14 percent in each year. The sampling design for respondent's Celebrity Room charge sale analysis was a stratified random sample designed by professional statisticians. Respondent's *96 statistical expert analyzed the data collected pursuant to this design, and he determined that the tip percentage reflected by the analysis was reasonably precise. Respondent determined petitioner's corrected total tip income, relative to his employment in the Celebrity Room, by the following method: (a) Determined the average tip percentage for Celebrity Room customers by computing the percentage relationship between charged sales and charged tips on random days. (b) Determined total food and beverage sales, including taxes, for the years at issue. (c) Eliminated 20 percent of total food and beverage sales to account for customers who may not have tipped. (d) Multiplied adjusted sales by the average tip percentage ascertained by the charge sales analysis to arrive at gross tips. (e) Reduced gross tips by 16.67 percent to account for amounts given to busboys and bartenders. (f) Divided adjusted tips by total paid hours for all waiters and waitresses on an annual basis to arrive at an hourly tip rate. The Celebrity Room hourly tip rate, as initially determined by respondent, was $7.10 per hour in 1974 and $8.14 per hour in 1975. These figures were subsequently *97 increased to $8.75 and $8.89, respectively. After making adjustments to respondent's formula with respect to the tip percentage of gross cash sales, the non-tippers percentage of cash sales and providing for a non-tippers percentage of charge sales, the tip rate per hour for each waiter and waitress in the Celebrity Room was $6.15 for 1974 and $7.10 for 1975. Petitioner did not keep a daily record of his tip income for 1974 and 1975. ULTIMATE FINDINGS OF FACT 1. Petitioner received substantial amounts of unreported tip income in 1974 and 1975. 2. Part of the underpayment of tax for the years 1974 and 1975 resulting from petitioner's understatements of tip income was due to his negligence or intentional disregard of the income tax rules and regulations. OPINION It is well established that tips and gratuities are compensation for services rendered. They are therefore includable in gross income under section 61(a). Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). Taxpayers are required by section 6001 and the regulations thereunder to keep records which are sufficient to enable the respondent to determine their correct tax liability. When taxpayers *98 receive income from tips this requirement necessarily includes accurate, contemporaneously maintained diaries of tip income. Such records must be retained by the taxpayer "so long as the contents thereof may become material in the administration of any internal revenue law." Section 1.6001-1(e), Income Tax Regs.
If a taxpayer keeps no records of tip income, or the records do not clearly reflect income, respondent is authorized by section 446 to compute income by a method which, in his opinion, does clearly reflect income. Meneguzzo v. Commissioner, 43 T.C. 824 (1965). Here the petitioner kept no records of his tip income for the years 1974 and 1975. Consequently, respondent reconstructed his tip income by the use of a method he deemed reliable for this type of case. The method used by respondent is a tip computation formula based upon sales and payroll records kept by the petitioner's employer, MGM.This indirect method to test and calculate the petitioner's tip income is proper and reasonable. Comparable methods have been approved by the courts. Meneguzzo v. Commissioner, supra at 831-834; Mendelson v. Commissioner,305 F.2d 519, 523 (7th Cir. 1962), *99 affirming T.C. Memo. 1961-319. Respondent cannot be expected to reconstruct income with mathematical precision. While respondent's formula was reasonable, we think his determination of the unreported tip income of petitioner requires adjustments and our findings of fact reflect them. In our opinion the evidence in this case shows that the petitioner substantially understated his tip income for the years in issue. Charge sales make up a portion of total sales in the Celebrity Room. When Celebrity Room customers charge their bills to their rooms or on credit cards, they may leave a tip on the voucher they are required to sign. In those instances the waiter or waitress receives the tip through the showroom cashier. Similarly, the waiters and waitresses receive guaranteed tips on coupon sales by turning in the coupon to the cashier. The business records of the MGM Grand reflect tips paid out by the cashier to Celebrity Room waiters and waitresses totaling $438,543.95 in 1974 and $427,729.68 in 1975 from credit card sales, room charges and coupon sales. None of these tips appeared on the Forms W-2 provided to the waiters and waitresses unless they were declared to *100 the employer by the waiters and waitresses. Presumably each waiter and waitress served a proportionate share of charge customers and coupon customers since stations were rotated on an equitable basis, and the customers were seated without favoritism to individual waiters and waitresses. Thus, it is reasonable to infer that each waiter or waitress received a proportionate share of the tips paid out by the Celebrity Room cashier. The average amount of tips paid out to Celebrity Room waiters and waitresses on a per hour basis was $3.76 for 1974 and $3.64 for 1975. Petitioner argues that application of the tip formula is erroneous because he worked fewer hours than others. There is no evidence as to the number of hours worked by the average waiter or waitress. However, since the petitioner did not begin his employment with MGM until April 12, 1974, the number of hours he worked during that year was less. Respondent took into account differences in hours in the application of the tip formula. In other words, the amount of tip income determined for each waiter or waitress depended upon the number of hours shown for that waiter or waitress. Petitioner suggests that the determination *101 made in his case could still be erroneous because his hours attributable to guaranteed pay might be disproportionately high. However, he testified that he did not keep track of the number of days he worked and he gave only vague testimony as to how often he worked less than the guaranteed four-day week. Petitioner has not established that his hours of guaranteed pay were higher than those of the average waiter or waitress. Petitioner reported tip income of $2,302.00 for 1974 and $3,493.75 for 1975. Dividing these figures by his total hours results in an average per hour tip rate of $2.23 for 1974 and $2.39 for 1975. Thus, he reported tip income at a rate substantially below the rate of tips paid out by the MGM on charge sales and coupon sales alone. It is difficult for us to conceive of such low tip rates in the Celebrity Room of the MGM, where the minimum charge was $17.50 per person, where the charge sales showed an average tip percentage of 14 percent, and where guaranteed tips on coupon sales were equal to 15 percent of the cost of the show. Petitioner asserts that respondent's determination is wrong for the following reasons: (1) Respondent analyzed only a sample of *102 credit card sales rather than all credit card sales, and did not tie particular credit card sales to the waiter or waitress who made the sale. (2) Respondent included taxes on the sales used in the tip formula. (3) Waiters do not spend all their working hours actually serving the customers. (4) The total hours paid to waiters and waitresses include guaranteed pay for shifts which were not actually worked. (5) The number of customers served depends on the station. (6) The Celebrity Room was rarely filled to capacity. Respondent's credit card analysis covered a random sample of 52 days in 1974 and 12 days in 1975. The sampling design was devised by professional statisticians. Respondent's statistical expert analyzed the data collected pursuant to the sampling design to determine the precision of the tip percentage derived from the sample. He concluded the 1974 percentage had a precision of two-tenths of one percent and the 1975 percentage had a precision of three-tenths of one percent. Stated another way, if the sample were repeated using a different 52 random days in 1974, respondent's statistical expert is 90 percent confident that the average tip percentage in the *103 new sample would be no lower than two-tenths of one percent below the percentage determined in the original sample. Likewise, the 90 percent confidence level for the 1975 sample is within three-tenths of one percent of the original sample. The sampling design thus proved to be precise in its application. Respondent is under no duty to analyze every charge sale made during the period when the relevant data can be accurately obtained through a random sample. The arguments made by petitioner demonstrate a misconception of the application of respondent's tip formula. Logical consistency requires that taxes be included in the sales figures of the tip formula since taxes were included in the credit card sales analyzed. If taxes were excluded from total sales in part B of respondent's formula, they also would have to be excluded from the credit card sample of part A. The validity of the formula is not affected by the fact that waiters and waitresses in the Celebrity Room are in contact with the customers for only a portion of their total working hours. All waiters and waitresses are in the same situation with regard to set-up and clean-up time. Thus, the total hours shown on the *104 payroll records is the best common denominator from which tip income can be computed. Even the inclusion of hours attributable to guaranteed pay does not create error on the individual level. All waiters and waitresses occasionally were sent home with pay. These hours of guaranteed pay were included in the MGM payroll records as if the hours actually had been worked. Thus, the total hours used in respondent's tip formula were actually overstated to the extent they were attributable to guaranteed pay. Likewise, the less than capacity attendance in the Celebrity Room and the number of customers seated in any particular station do not detract from the validity of the tip formula. The formula is based upon sales rather than attendance. Sales are naturally lower than they would have been with higher attendance figures. Thus, the formula does take into account the level of room operations. Moreover, even if certain stations were sparsely seated on slow nights, the rotation of waiters and waitresses insures that each has an equal opportunity to work the busier stations. There is no reason to believe that petitioner worked a disproportionate number of slow stations. Accordingly, *105 on this record we hold that the petitioner had additional unreported tip income as set forth in our findings of fact. We also hold that the petitioner was negligent in substantially understating his tip income and in failing to keep adequate records. Therefore, the additions to tax determined by respondent under section 6653(a) are sustained. Meneguzzo v. Commissioner, 43 T.C. 824, 836 (1965); Schroeder v. Commissioner, 40 T.C. 30, 34 (1963). To reflect our findings and conclusions herein, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩