MARY L. APPLEGATE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Applegate v. Commissioner
Docket No. 7806-78.
United States Tax Court
T.C. Memo 1980-497; 1980 Tax Ct. Memo LEXIS 86; 41 T.C.M. (CCH) 320; T.C.M. (RIA) 80497; November 5, 1980, Filed Mary L. Applegate, pro se. Cynthia J. Olson, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $2,526.12 in petitioner's Federal income tax for the year 1975 and an addition to tax of $126.31 under section 6653(a). [1]
*87 Respondent made certain concessions at the trial. The issues remaining for decision are (1) whether the petitioner understated her tip income for the year 1975; (2) whether she is entitled to any deduction for "walkouts"; (3) whether she is entitled to a deduction for contributions in excess of the amount allowed by respondent; and (4) whether she is liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Mary L. Applegate (petitioner) was a legal resident of Las Vegas, Nevada, when she filed her petition in this case. During 1975 petitioner was employed as a full-time waiter in the Celebrity Room of the MGM Grand Hotel (hereinafter referred to as MGM or the employer) in Las Vegas, Nevada. For the year 1975 the petitioner had 1,656 of paid hours (excluding vacation and sick leave but including the overtime hours she actually worked) relative to her work as a waitress. While employed as a Celebrity Room waitress, petitioner received tips from her customers in cash, by credit card sales, room charges and coupon sales. None of *88 these tips were included on the Forms W-2 provided to the petitioner unless the tips were specifically declared to the employer by her. Petitioner reported tip income on her 1975 Federal income tax return as follows: Tips Reported
Additional Tips
To Employer
Reported on Return
Total
$3,050.00
0
$3,050.00
The Celebrity Room showroom is a large room wherein the MGM presents a floor show twice nightly--a dinner show and a cocktail show. During 1975 the minimum charge for both the dinner and cocktail shows at the Celebrity Room was $17.50. The Celebrity Room is considered a desirable place to work for waiters and waitresses, and the turnover rate was very low during 1975. The customer seating area in the Celebrity Room is divided into thirty stations. Each of the thirty stations in the Celebrity Room had seats for up to 48 customers. Waiters and waitresses working the dinner show work in two-person teams, with one team serving each station. The stations remain the same at the cocktail show, but they are serviced by only one waiter or waitress. The other waiters and waitresses are scheduled to go home after the dinner show, alternating every night.
*89 The Celebrity Room customer attendance during 1975 totaled 567,904. During the year at issue waiters and waitresses were rotated throughout the stations of the Celebrity Room so that each waiter and waitress had an equal opportunity to work all the stations in the room. On nights when petitioner worked the dinner show at the Celebrity Room, she pooled the tips received from that show with her station partner, paid 15 percent of that amount to the busboy, paid a few dollars to the bartender, and split the remainder with her station partner. On nights when petitioner stayed to work the cocktail show at the Celebrity Room, she did not pool the tips received for that show, but gave approximately 15 percent of the tips to the busboy and a few dollars to the bartender. The duties of all Celebrity Room waiters and waitresses include serving the food, collecting the checks, setting up for both shows, and clearing the tables after the shows. Thus, all waiters and waitresses had the same ratio of paid set-up and clean-up time to actual serving time. For the year at issue the Celebrity Room waiters was waitresses were covered by a culinary workers' union contract which provided *90 that they were guaranteed hourly wages for four days per week. When the level of Celebrity Room attendance was down a few stations in upper tiers of the room were closed and the waiters and waitresses assigned to work those stations were released from their scheduled shifts. If a waiter or waitress were released without actually having worked a four day week, the waiter or waitress would be paid for the scheduled shift, and the hours for that shift would be reflected in the payroll records as having been worked. The rotation system employed in the Celebrity Room was such that waiters and waitresses worked their first work day of the week in the "pit" (front stations) and rotated each day toward the back stations, so that on their fifth work day they were scheduled to work in the upper tiers of the room. Therefore, the waiters and waitresses who normally were released from work on a slow night were the ones who already had worked a four day week. The Celebrity Room cashier paid out to Celebrity Room waiters and waitresses charged tips and guaranteed tips on coupon sales totaling $427,729.68 in 1975. Coupon sales in the Celebrity Room represent sales from individual or *91 group tour packages. Gratuities for showroom waiters and waitresses are added to the price of the package, which gratuities during the years at issue were usually equal to 15 percent of the cost of the show, excluding taxes. The paid hours for Celebrity Room waiters and waitresses, excluding vacations and sick leave but including overtime hours only to the extent they represent hours actually worked, totaled 117,535 in 1975. The average per hour tips paid out by the Celebrity Room cashier to individual waiters and waitresses, computed by dividing total tips paid out by total waiter-waitress hours, was $3.64 in 1975. The Celebrity Room food and beverage sales, including sales tax and cabaret tax, but excluding the excess of minimum charges over actual food and beverage sales, totaled $10,256,023 for 1975. The Celebrity Room total sales, including sales tax, cabaret tax, and the excess of minimum charges over actual food and beverage sales, were $11,196,125.50 in 1975. The average sale per Celebrity Room customer, determined by dividing the total room sales by the total room attendance, was $19.71 in 1975. The average per hour number of patrons served by Celebrity *92 Room waiters and waitresses, determined by dividing total room attendance by total paid hours, was 4.8 in 1975. Petitioner served the average number of Celebrity Room customers per work hour. Thus, she served 7,949 customers during 1975, computed by multiplying the average per hour number of patrons served by her total paid hours. The actual number of customers served would be higher since petitioner worked in a two-person team at the dinner shows. However, since she split the tips received at the dinner show with her station partner, the above figure accurately represents the number of customers from which she could have received tips. Since petitioner served the average number of Celebrity Room customers per work hour, the total sales attributable to customers served by her, computed by multiplying the customers served by the average sale per customer, were $156,674.79 in 1975. Dividing the total tips reported by petitioner by the Celebrity Room sales attributable to customers served by her resulted in an average tip percentage of 1.9 percent in 1975. The hourly rate of tips reported by petitioner, computed by dividing the total amounts reported by her total paid *93 hours, was $1.84 in 1975. In deriving the tip rate applicable to Celebrity Room waiters and waitresses, respondent analyzed Celebrity Room Master Charge sales, American Express sales and sales charged to customers' hotel rooms for 12 days in 1975. Charge sales which did not include tips were not included in this sample. The charge sales including tips totaled $47,906.05 for the 12 days sampled in 1975. Tips on these sales totaled $6,489.56 in 1975, or 14 percent in that year. The sampling design for respondent's Celebrity Room charge sale analysis was a stratified random sample designed by professional statisticians. Respondent's statistical expert analyzed the data collected pursuant to this design, and he determined that the tip percentage reflected by the analysis was reasonably precise. Respondent determined petitioner's corrected total tip income, relative to her employment in the Celebrity Room, by the following method: (a) Determined the average tip percentage for Celebrity Room customers by computing the percentage relationship between charged sales and charged tips on random days. (b) Determined total food and beverage sales, including taxes, for the year *94 at issue. (c) Eliminated 20 percent of total food and beverage sales to account for customers who may not have tipped. (d) Multiplied adjusted sales by the average tip percentage ascertained by the charge sales analysis to arrive at gross tips. (e) Reduced gross tips by 16.67 percent to account for amounts given to busboys and bartenders. (f) Divided adjusted tips by total paid hours for all waiters and waitresses on an annual basis to arrive at an hourly tip rate. The Celebrity Room hourly tip rate, as initially determined by respondent, was $8.14 per hour in 1975. This figure was subsequently increased to $8.89. After making adjustments to respondent's formula with respect to the tip percentage of gross cash sales, the non-tippers percentage of cash sales and providing for a non-tippers percentage of charge sales, the tip rate per hour for each waiter and waitress in the Celebrity Room was $7.10 for 1975. Petitioner submitted a tip diary for 1975 at the trial of this case, although on April 1, 1977, she told one of respondent's agents that she disposed of her tip diary for that year because she did not keep any records more than one year. The tip diary is unreliable. *95 ULTIMATE FINDINGS OF FACT 1. Petitioner received substantial amounts of unreported tip income in 1975. 2. Petitioner failed to prove her claimed deduction for "walkouts." 3. Petitioner failed to substantiate a deduction for contributions in excess of the amount allowed by the respondent. 4. Part of the underpayment of tax for the year 1975 resulting from petitioners' understatements of tip income was due to their negligence or intentional disregard of the income tax rules and regulations. OPINION It is well established that tips and gratuities are compensation for services rendered. They are therefore includable in gross income under section 61(a). Schroeder v. Commissioner,40 T.C. 30, 33 (1963). Taxpayers are required by section 6001 and the regulations thereunder to keep records which are sufficient to enable the respondent to determine their correct tax liability. When taxpayers receive income from tips this requirement necessarily includes accurate, contemporaneously maintained diaries of tip income. Such records must be retained by the taxpayer "so long as the contents thereof may become material in the administration of any internal *96 revenue law." Section 1.6001-1(e), Income Tax Regs.
If a taxpayer keeps no records of tip income, or the records do not clearly reflect income, respondent is authorized by section 446 to compute income by a method which, in his opinion, does clearly reflect income. Meneguzzo v. Commissioner,43 T.C. 824 (1965). In this case the petitioner presented a tip diary which is unreliable. Consequently, respondent reconstructed her tip income by the use of a method he deemed reliable for this type of case. The method used by respondent is a tip computation formula based upon sales and payroll records kept by the petitioner's employer. This indirect method to test and calculate the petitioner's tip income is proper and reasonable. Comparable methods have been approved by the courts. Meneguzzo v. Commissioner,supra at 831-834; Mendelson v. Commissioner,305 F.2d 519, 523 (7th Cir. 1962), affirming T.C. Memo. 1961-319. Respondent cannot be expected to reconstruct income with mathematical precision. While respondent's formula was reasonable, we think his determination of the unreported tip income of the petitioner requires *97 adjustments and our findings of fact reflect them. Petitioner presented no evidence to refute the validity and reasonableness of respondent's tip formula. She has attempted to avoid application of the formula in her case by relying upon her purported tip diary which, she asserts, is an accurate and complete record of her tip income for 1975. We think her reliance on the tip diary is misplaced in view of the contradictions between her testimony and the information contained in the diary. The essence of petitioner's testimony is that her tip income varied widely during 1975. However, the tip diary she submitted shows remarkably consistent entries. Over 32 percent of the daily entries were either $9 or $10, and 52 percent of the entries were between $9 and $12. The tip diary hardly reflects the wide variations she described. Nor does the diary reflect her description of seasonal variances. Petitioner testified that summer was the best season and that December was "extremely bad." Her tip diary shows otherwise. The average daily entry in her diary for the month of December is $11.50, or only $.05 lower than the average daily entries for June, July and August. Moreover, the *98 petitioner testified that her average take-home tips for the cocktail show were between $12 and $20, and that her tips were usually higher for the dinner show. Generally, she worked both the dinner and cocktail shows on alternate nights. For the dates on which she worked both shows, one would expect to see diary entries in excess of $24 and $40. The entries should show her tips for the cocktail show (between $12 and $20) plus a larger amount of tips for the dinner show. But the entries in the diary do not vary from their extremely narrow range. Out of 230 entries, only 8 are in amounts over $20, and the highest entry is $26. We think the introduction of the tip diary at the trial is even more mysterious than the entries contained therein. Petitioner submitted no tip diary at the time she was interviewed by respondent's agent pursuant to the audit of her 1975 return. On April 1, 1977, she explained to respondent's agent that she disposed of her 1975 diary because she did keep any records after one year. Thus, there is no explanation for the convenient reappearance of her tip diary at the time of trial. Charge sales make up a portion of total sales in the Celebrity Room. *99 When Celebrity Room customers charge their bills to their rooms or on credit cards, they may leave a tip on the voucher they are required to sign. In those instances the waiter or waitress receives the tip through the showroom cashier. Similarly, the waiters and waitresses receive guaranteed tips on coupon sales by turning in the coupon to the cashier. The business records of the MGM Grand reflect tips paid out by the cashier to Celebrity Room waiters and waitresses totaling $427,729.68 in 1975 from credit card sales, room charges and coupon sales. None of these tips appeared on the Forms W-2 provided to the waiters and waitresses unless they were declared to the employer by the waiters and waitresses. Presumably each waiter and waitress served a proportionate share of charge customers and coupon customers since stations were rotated on an equitable basis, and the customers were seated without favoritism to individual waiters and waitresses. Thus, it is reasonable to infer that each waiter or waitress received a proportionate share of the tips paid out by the Celebrity Room cashier. The average amount of tips paid out to Celebrity Room waiters and waitresses on a per hour basis *100 was $3.64 for 1975. Petitioner contends that respondent's determination is erroneous for the following reasons: (1) Respondent analyzed only a sample of credit card sales rather than all credit card sales, and did not tie particular credit card sales to the waiter or waitress who made the sale. (2) Respondent included taxes on the sales used in the tip formula. (3) Waiters do not spend all their working hours actually serving the customers. (4) The total hours paid to waiters and waitresses include guaranteed pay for shifts which were not actually worked. (5) The number of customers served depends on the station. (6) The Celebrity Room was rarely filled to capacity. Respondent's credit card analysis covered a random sample of 12 days in 1975. The sampling design was devised by professional statisticians. Respondent's statistical expert analyzed the data collected pursuant to the sampling design to determine the precision of the tip percentage derived from the sample. He concluded that the 1975 percentage had a precision of three-tenths of one percent. Stated another way, if the sample were repeated using a different 12 random days in 1975, respondent's statistical *101 expert is 90 percent confident that the average tip percentage in the new sample would be no lower than three-tenths of one percent below the percentage determined in the original sample. The sampling design thus proved to be reasonably precise in its application. Respondent is under no duty to analyze every charge sale made during the period when the relevant data can be accurately obtained through a random sample. The arguments made by petitioner demonstrate a misconception of the application of respondent's tip formula. Logical consistency requires that taxes be included in the sales figures of the tip formula since taxes were included in the credit card sales analyzed. If taxes were excluded from total sales in part B of respondent's formula, they also would have to be excluded from the credit card sample of part A. The validity of the formula is not affected by the fact that waiters and waitresses in the Celebrity Room are in contact with the customers for only a portion of their total working hours. All waiters and waitresses are in the same situation with regard to set-up and clean-up time. Thus, the total hours shown on the payroll records is the best common denominator *102 from which tip income can be computed. Even the inclusion of hours attributable to guaranteed pay does not create error on the individual level. All waiters and waitresses occasionally were sent home with pay. These hours of guaranteed pay were included in the MGM payroll records as if the hours actually had been worked. Thus, the total hours used in respondent's tip formula were actually overstated to the extent they were attributable to guaranteed pay. Likewise, the less than capacity attendance in the Celebrity Room and the number of customers seated in any particular station do not detract from the validity of the tip formula. The formula is based upon sales rather than attendance. Sales are naturally lower than they would have been with higher attendance figures. Thus, the formula does take into account the level of room operations. Moreover, even if certain stations were sparsely seated on slow nights, the rotation of waiters and waitresses insures that each has an equal opportunity to work the busier stations. There is no reason to believe that petitioner worked a disproportionate number of slow stations. Accordingly, we hold on this record that the petitioner substantially *103 understated her tip income for 1975 as set forth in our findings of fact. We also hold that the petitioner failed to sustain her burden of proving that she is entitled to deductions for "walkouts." Her testimony was vague and unconvincing. She did not record in her tip diary any amounts paid for "walkouts" even though the diary served purposes other than the recording of tip income. Petitioner presented no evidence with respect to her claimed deduction for contributions. Therefore, we sustain respondent's determination as to the contributions adjustment. Finally, we conclude that the petitioner was negligent in substantially understating her tip income and in failing to keep adequate records. Therefore, the addition to tax determined by respondent under section 6653(a) is sustained. Meneguzzo v. Commissioner,43 T.C. 824, 836 (1965); Schroeder v. Commissioner,40 T.C. 30, 34 (1963). To reflect the concessions made by respondent and our findings and conclusions herein, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.↩