ALFONSO BERNAL AND REYNA I. BERNAL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bernal v. Commissioner
Docket No. 4895-78.
United States Tax Court
T.C. Memo 1980-498; 1980 Tax Ct. Memo LEXIS 87; 41 T.C.M. (CCH) 325; T.C.M. (RIA) 80498; November 5, 1980, Filed Alfonso Bernal and Reyna I. Bernal, pro se. Cynthia J. Olson, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in the petitioners' Federal income taxes and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(a) [1]
1974
2,266.00
$113.30
1975
3,442.84
17.14
*88 Respondent made certain concessions at the trial. The issues remaining for decision are (1) whether the petitioners understated their tip income for the years 1974 and 1975 and (2) whether they are liable for the additions to tax under section 6653(a) for negligence or intentional disregard to rules and regulations. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Alfonso and Reyna I. Bernal (petitioners) were legal residents of Las Vegas, Nevada, when they filed their petition in this case. During 1974 and 1975 Alfonso was employed as a fulltime waiter in the Celebrity Room of the MGM Grand Hotel (hereinafter referred to as MGM or the employer) in Las Vegas, Nevada. He had experience as a waiter prior to his employment with MGM. Reyna was employed as a waitress in the Palm Room coffee shop of the Stardust Hotel (hereinafter Stardust) on May 31, 1972. She continued as a Palm Room waitress, working the dinner shift, until April 22, 1975, when she became a cocktail waitress at the Stardust. *89 For the years 1974 and 1975 the petitioners' paid hours (excluding vacation and sick leave but including the overtime hours they actually worked) relative to their work as a waiter and waitress were: 1974
1975
Alfonso Bernal (MGM)
1,560
1,634
Reyna I. Bernal (Stardust)
Palm Room
1,026
392
Cocktails
1,051
In addition to the hours set forth above, Reyna worked as a hostess at the Stardust for 208 hours in 1974 and 212 hours in 1975. While employed as a Celebrity Room waiter, Alfonso received tips from his customers in cash, by credit card sales, room charges and coupon sales. During her employment as a waitress at the Stardust, Reyna received tip income in cash, by credit card sales and by room charges. During 1974 she also received guaranteed tips on coupon sales in the amount of $19.60, which was included as wages on the Form W-2 provided by the Stardust. None of these tips were included on the Forms W-2 provided to the petitioners unless the tips were specifically declared to the employer by them. Petitioners reported tip income on their 1974 and 1975 Federal income tax returns as follows: 1974
Tips Reported
Additional Tips
To Employer
Reported on Return
Total
Alfonso Bernal
$1,576.00
$1,955.00
$3,531.00
Reyna I. Bernal
147.42
200.00
347.42
1975
Alfonso Bernal
$2,375.00
$1,140.00
$3,515.00
Reyna I. Bernal
0
605.00
605.00
*90 The Celebrity Room showroom is a large room wherein the MGM presents a floor show twice nightly--a dinner show and a cocktail show. During most of 1974 and 1975 the minimum charge for both the dinner and cocktail shows at the Celebrity Room was $17.50. The Celebrity Room is considered a desirable place to work for waiters and waitresses, and the turnover rate was very low during the years 1974 and 1975. The customer seating area in the Celebrity Room is divided into thirty stations. Each of the thirty stations in the Celebrity Room has seats for up to 48 customers. Waiters and waitresses working the dinner show work in two-person teams, with one team serving each station. The stations remain the same at the cocktail show, but they are serviced by only one waiter of waitress. The other waiters and waitresses are scheduled to go home after the dinner show, alternating every night. The Celebrity Room customer attendance during 1974 and 1975 totaled 548,207 and 567,904, respectively. During the years at issue waiters and waitresses were rotated throughout the stations of the Celebrity Room so that each waiter and waitress had an equal opportunity to work all the stations *91 in the room. On nights when Alfonso worked the dinner show at the Celebrity Room, he pooled the tips received from that show with his station partner, paid 15 percent of that amount to the busboy, paid a few dollars to the bartender, and split the remainder with his station partner. On nights when Alfonso stayed to work the cocktail show at the Celebrity Room, he did not pool the tips received for that show, but gave approximately 15 percent of the tips to the busboy and a few dollars to the bartender. The duties of all Celebrity Room waiters and waitresses include serving the food, collecting the checks, setting up for both shows, and clearing the tables after the shows. Thus, all waiters and waitresses had the same ratio of paid set-up and clean-up time to actual serving time. For the years at issue the Celebrity Room waiters and waitresses were covered by a culinary workers' union contract which provided that they were guaranteed hourly wages for four days per week. When the level of Celebrity Room attendance was down a few stations in upper tiers of the room were closed and the waiters and waitresses assigned to work those stations were released from their scheduled *92 shifts. If released without actually having worked a four day week, the waiter or waitress would be paid for the scheduled shift, and the hours for that shift would be reflected in the payroll records as having been worked. The rotation system employed in the Celebrity Room was such that waiters and waitresses worked their first work day of the week in the "pit" (front stations) and rotated each day toward the back stations, so that on their fifth work day they were scheduled to work in the upper tiers of the room. Therefore, the waiters and waitresses who normally were released from work on a slow night were the ones who already had worked a four day week. The Celebrity Room cashier paid out to Celebrity Room waiters and waitresses charged tips and guaranteed tips on coupon sales totaling $438,543.95 in 1974 and $427,729.68 in 1975. Coupon sales in the Celebrity Room represent sales from individual or group tour packages. Gratuities for showroom waiters and waitresses are added to the price of the package, which gratuities during the years at issue were usually equal to 15 percent of the cost of the show, excluding taxes. The paid hours for Celebrity Room waiters and *93 waitresses, excluding vacations and sick leave but including overtime hours only to the extent they represent hours actually worked, totaled 116,784 in 1974 and 117,535 in 1975. The average per hour tips paid out by the Celebrity Room cashier to individual waiters and waitresses, computed by dividing total tips paid out by total waiter-waitress hours, was $3.76 in 1974 and $3.64 in 1975.
The Celebrity Room food and beverage sales, including sales tax and cabaret tax, but excluding the excess of minimum charges over actual food and beverage sales, totaled $8,879,393 for 1974 and $10,256,023 for 1975. The Celebrity Room total sales, including sales tax, cabaret tax, and the excess of minimum charges over actual food and beverage sales, were $9,951,478.69 in 1974 and $11,196,125.50 in 1975. The average sale per Celebrity Room customer, determined by dividing the total room sales by the total room attendance, was $18.15 in 1974 and $19.71 in 1975. The average per hour number of patrons served by Celebrity Room waiters and waitresses, determined by dividing total room attendance by total paid hours, was 4.7 in 1974 and 4.8 in 1975. Alfonso served the average number of Celebrity *94 Room customers per work hour. Thus, he served the following number of customers during the years at issue, computed by multiplying the average per hour number of patrons served by his total paid hours: 1974
1975
7,332
7,843
The actual number of customers served would be higher since Alfonso worked in a two-person team at the dinner shows. However, since he split the tips received at the dinner show with his station partner, the above figures accurately represent the number of customers from which he could have received tips. Since Alfonso served the average number of Celebrity Room customers per work hour, the total sales attributable to customers served by him, computed by multiplying the customers served by the average sale per customer, were as follows: 1974
1975
$133,075.80
$154,585.53
Dividing the total tips reported by Alfonso by the Celebrity Room sales attributable to customers served by him results in the following average tip percentages: 1974
1975
2.7%
2.3%
The hourly rate of tips reported by Alfonso, computed by dividing the total amounts reported by his total paid hours, is as follows: 1974
1975
$2.26
$2.15
*95 In deriving the tip rate applicable to Celebrity Room waiters and waitresses, respondent analyzed Celebrity Room Master Charge sales, American Express sales and sales charged to customers' hotel rooms for 52 days in 1974 and 12 days in 1975. Charge sales which did not include tips were not included in this sample. The charge sales including tips totaled $185,636.06 for the 52 days sampled in 1974 and $47,906.05 for the 12 days sampled in 1975. Tips on these sales totaled $25,960.56 in 1974 and $6,489.56 in 1975, or 14 percent in each year. The sampling design for respondent's Celebrity Room charge sale analysis was a stratified random sample designed by professional statisticians. Respondent's statistical expert analyzed the data collected pursuant to this design, and he determined that the tip percentage reflected by the analysis was reasonably precise. Respondent determined Alfonso's corrected total tip income, relative to his employment in the Celebrity Room, by the following method: (a) Determined the average tip percentage for Celebrity Room customers by computing the percentage relationship between charged sales and charged tips on random days. (b) Determined *96 total food and beverage sales, including taxes, for the years at issue. (c) Eliminated 20 percent of total food and beverage sales to account for customers who may not have tipped. (d) Multiplied adjusted sales by the average tip percentage ascertained by the charge sales analysis to arrive at gross tips. (e) Reduced gross tips by 16.67 percent to account for amounts given to busboys and bartenders. (f) Divided adjusted tips by total paid hours for all waiters and waitresses on an annual basis to arrive at an hourly tip rate. The Celebrity Room hourly tip rate, as initially determined by respondent, was $7.10 per hour in 1974 and $8.14 per hour in 1975. These figures were subsequently increased to $8.75 and $8.89, respectively. After making adjustments to respondent's formula with respect to the tip percentage of gross cash sales, the non-tippers percentage of cash sales and providing for a non-tippers percentage of charge sales, the tip rate per hour for each waiter and waitress in the Celebrity Room was $6.15 for 1974 and $7.10 for 1975. The Palm Room coffee shop is located on the main floor of the Stardust. The restaurant has 19 stations, 9 of which are located *97 on an outdoor patio. Each station contains approximately 4 to 5 tables and is serviced by one waitress. Of the 19 stations in the Palm Room, 15 are available for service to the general public. The other 4 stations are reserved for VIP's, dealers and general employees. Waitresses employed in the Palm Room rotate daily through the 15 stations available to the general public. However, those waitresses who work the 4 reserved stations do not rotate. Throughout her employment as a waitress in the Palm Room, Reyna worked in the 15 stations available to the general public. Palm Room waitresses do not pool tips and do not split their tips with anyone except the busboy. Normally there is one busboy working for every three stations, and it is customary for the waitresses to give him approximately 15 percent of the tips received. Total Palm Room sales, exclusive of bar sales and sales tax, were $3,293,768.07 for 1974 and $3,910,114.88 for 1975. Waitresses employed in the Palm Room were paid for a total of 188,297 hours in 1974 and 224,008 hours in 1975, excluding those hours attributable to sick leave, vacations, and including overtime hours only to the extent they represent *98 hours actually worked. The average Palm Room sales per waitress hour, computed by dividing total yearly Palm Room sales by total waitress hours, were $17.49 in 1974 and $17.46 in 1975. The Palm Room sales attributable to customers served by Reyna, computed by multiplying the average sales per waitress hour by her paid hours for work in the Palm Room, were $17,944.74 in 1974 and $6,844.32 in 1975. Dividing the total tips reported in 1974 by Reyna by the 1974 Palm Room sales attributable to customers she served results in an average tip percentage of 1.9 percent. Dividing the total tips reflected on the 1974 tip diary of Reyna by the 1974 Palm Room sales attributable to customers she served results in an average tip percentage of 3.1 percent. In deriving the tip rate pertaining to waitresses employed in the Palm Room, respondent analyzed Rpalm Room Master Charge sales, Diners Club sales and American Express sales for 52 days in 1975. Total sales, including sales tax, on the 1975 credit card charges analyzed were in the amount of $1,522.94. Tips included on these credit card sales totaled $234.20. Respondent also analyzed Palm Room charge sales for 1974, but the only records *99 available were for the American Express charges during the last three months of the year. Tips on the latter charges averaged 17.62 percent. Respondent determined the average hourly rate of tips received by Palm Room waitresses by essentially the same method used for the Celebrity Room. In this manner respondent determined waitresses employed in the Palm Room received tip income at the rate of $1.86 per hour in 1974 and $1.85 per hour in 1975. Respondent determined that cocktail waitresses employed at the Stardust received tip income during 1975 at the rate of $2.50 per hour. This determination was based upon interviews with cocktail waitresses and evidence of tipping practices in the industry. Because of the unavailability of sufficient independent records regarding tipping practices in connection with cocktail sales, respondent was unable to develop a tip formula which was entirely adequate to determine the rate of tips received by Stardust Cocktail waitresses. However, respondent's attempts to develop such a tip formula did reveal an average tip percentage of 20 percent on charge sales of cocktails. Respondent's determination of the average hourly rate of tips received *100 by Stardust cocktail waitresses is consistent with the testimony of Reyna that per tip income was higher as a cocktail waitress than it was as a waitress in the Palm Room. Respondent determined that waitresses in the Palm Room received tips at the hourly rate of $1.85 in 1974 and 1975, whereas cocktail waitresses received tips at the hourly rate of $2.50. After making adjustments to respondent's formula, the tip rate per hour for a waitress in the Palm Room was $1.70 in 1974 and 1975, and the tip rate per hour for a cocktail waitress in 1975 was $2.30. Both petitioners submitted tip diaries at the trial of this case, but the diaries are unreliable. ULTIMATE FINDINGS OF FACT 1. Petitioners received substantial amounts of unreported tip income in 1974 and 1975. 2. Part of the underpayment of tax for the years 1974 and 1975 resulting from petitioners' understatements of tip income was due to their negligence or intentional disregard of the income tax rules and regulations. OPINION It is well established that tips and gratuities are compensation for services rendered. They are therefore includable in gross income under section 61(a). Schroeder v. Commissioner,40 T.C. 30, 33 (1963). *101 Taxpayers are required by section 6001 and the regulations thereunder to keep records which are sufficient to enable the respondent to determine their correct tax liability. When taxpayers receive income from tips this requirement necessarily includes accurate, contemporaneously maintained diaries of tip income. Such records must be retained by the taxpayer "so long as the contents thereof may become material in the administration of any internal revenue law." Section 1.6001-1(e), Income Tax Regs.
If a taxpayer keeps no records of tip income, or the records do not clearly reflect income, respondent is authorized by section 446 to compute income by a method which, in his opinion, does clearly reflect income. Meneguzzo v. Commissioner,43 T.C. 824 (1965). In this case the petitioners have presented tip diaries which are unreliable. Consequently, respondent reconstructed their tip income by the use of a method he deemed reliable for this type of case. The method used by respondent is a tip computation formula based upon sales and payroll records kept by the petitioners' employers. This indirect method to test and calculate the petitioners' tip income is proper *102 and reasonable. Comparable methods have been approved by the courts. Meneguzzo v. Commissioner,supra at 831-834; Mendelson v. Commissioner,305 F.2d 519, 523 (7th Cir. 1962), affirming T.C. Memo. 1961-319. Respondent cannot be expected to reconstruct income with mathematical precision. While respondent's formula was reasonable, we think his determination of the unreported tip income of both petitioners requires adjustments and our findings of fact reflect them. Alfonso Bernal presented no evidence to refute the validity and reasonableness of respondent's tip formula. He has attempted to avoid application of the formula in his case by relying upon his purported tip diary which, he asserts, is an accurate and complete record of his tip income for the years at issue. Although the amounts shown in the diary correspond to the amounts he reported, the uncontradicted evidence in this case shows a substantial understatement of tip income. Charge sales make up a portion of total sales in the Celebrity Room. When Celebrity Room customers charge their bills to their rooms or on credit cards, they may leave a tip on the voucher they *103 are required to sign. In those instances the waiter or waitress receives the tip through the showroom cashier. Similarly, the waiters and waitresses receive guaranteed tips on coupon sales by turning in the coupon to the cashier. The business records of the MGM Grand reflect tips paid out by the cashier to Celebrity Room waiters and waitresses totaling $438,543.95 in 1974 and $427,729.68 in 1975 from credit card sales, room charges and coupon sales. None of these tips appeared on the Forms W-2 provided to the waiters and waitresses unless they were declared to the employer by the waiters and waitresses. Presumably each waiter and waitress served a proportionate share of charge customers and coupon customers since stations were rotated on an equitable basis, and the customers were seated without favoritism to individual waiters and waitresses. Thus, it is reasonable to infer that each waiter or waitress received a proportionate share of the tips paid out by the Celebrity Room cashier. The average amount of tips paid out to Celebrity Room waiters and waitresses on a per hour basis was $3.76 for 1974 and $3.64 for 1975. By contrast, Alfonso's diary reflects tip income receivd at *104 the rate of $2.26 per hour in 1974 and $2.15 per hour in 1975. This is only 60 percent and 59 percent, respectively, of the average per hour rate of tips paid out by the MGM during 1974 and 1975. Since charge sales and coupon sales are only a portion of total sales, the omission of income in Alfonso's tip diary is readily apparent. To give any credibility to the diary we would have to assume not only that the tips he received through the cashier were consistently 40 percent below the amount received by the average waiter or waitress, but that he received no tips at all from cash sales or complimentary sales. Such an assumption is not justified. Viewing Alfonso's tip diary in the context of the number of customers served casts additional doubts on its reliability. The MGM attendance records for the Celebrity Room show total room attendance for 1974 and 1975 of 548,207 and 567,904, respectively. Again assuming that because of the equitable rotation of stations and seating of patrons, each waiter or waitress served a proportionate share of the total number of customers, the approximate number of customers served by each waiter or waitress can be computed by reference to the number *105 of hours worked. Under this analysis Alfonso served approximately 7,332 customers in 1974 and 7,843 customers in 1975. Dividing these numbers into the total tip income reported by him results in an average tip per customer of $.48 in 1974 and $.45 in 1975. In terms of the average sale per customer, Alfonso's tip diary reflects an average tip percentage of 2.7 percent for 1974 and 2.3 percent for 1975. It is difficult for us to conceive of such low tip rates in the Celebrity Room of the MGM, where the minimum charge was $17.50 per person, where the charge sales showed an average tip percentage of 14 percent, and where guaranteed tips on coupon sales were equal to 15 percent of the cost of the show. Alfonso submitted no additional evidence concerning the amount of his tip income, but argued that respondent's determination is erroneous for the following reasons: (1) Respondent analyzed only a sample of credit card sales rather than all credit card sales, and did not tie particular credit card sales to the waiter or waitress who made the sale. (2) Respondent included taxes on the sales used in the tip formula. (3) Waiters do not spend all their working hours actually serving *106 the customers. (4) The total hours paid to waiters and waitresses include guaranteed pay for shifts which were not actually worked. (5) The number of customers served depends on the station. (6) The Celebrity Room was rarely filled to capacity. Respondent's credit card analysis covered a random sample of 52 days in 1974 and 12 days in 1975. The sampling design was devised by professional statisticians. Respondent's statistical expert analyzed the data collected pursuant to the sampling design to determine the precision of the tip percentage derived from the sample. He concluded that the percentage had a precision of two-tenths of one percent and the 1975 percentage had a precision of three-tenths of one percent. Stated another way, if the sample were repeated using a different 52 random days in 1974, respondent's statistical expert is 90 percent confident that the average tip percentage in the new sample would be lo lower than two-tenths of one percent below the percentage determined in the original sample. Likewise, the 90 percent confidence level for the 1975 sample is within three-tenths of one percent of the original sample. The sampling design thus proved to be *107 exceptionally precise in its application. Respondent is under no duty to analyze every charge sale made during the period when the relevant data can be accurately obtained through a random sample. The remaining arguments made by Alfonso demonstrate a misconception of the application of respondent's tip formula. Logical consistency requires that taxes be included in the sales figures of the tip formula since taxes were included in the credit card sales analyzed. If taxes were excluded from total sales in part B of respondent's formula, they also would have to be excluded from the credit card sample of part A. The validity of the formula is not affected by the fact that waiters and waitresses in the Celebrity Room are in contact with the customers for only a portion of their total working hours.All waiters and waitresses are in the same situation with regard to set-up and clean-up time. Thus, the total hours shown on the payroll records is the best common denominator from which tip income can be computed. Even the inclusion of hours attributable to guaranteed pay does not create error on the individual level. All waiters and waitresses occasionally were sent home with pay. *108 These hours of guaranteed pay were included in the MGM payroll records as if the hours actually had been worked. Thus, the total hours used in respondent's tip formula were actually overstated to the extent they were attributable to guaranteed pay. Likewise, the less than capacity attendance in the Celebrity Room and the number of customers seated in any particular station do not detract from the validity of the tip formula. The formula is based upon sales rather than attendance. Sales are naturally lower than they would have been with higher attendance figures. Thus, the formula does take into account the level of room operations. Moreover, even if certain stations were sparsely seated on slow nights, the rotation of waiters and waitresses insures that each has an equal opportunity to work the busier stations. There is no reason to believe that Alfonso worked a disproportionate number of slow stations. On this record we hold that Alfonso has failed to carry his burden of proving the amount of tip income he received in 1974 and 1975. Certainly the amounts shown in his tip diary, when considered in the light of the evidence submitted, are substantially understated. Reyna *109 also claims to have maintained an accurate daily record of her tip income, and relies heavily on this purported record in attempting to refute the determination made by respondent. However, the evidence of tipping practices at the Stardust casts serious doubts upon this diary. The tip diary submitted by Reyna reflects tip income for 1974 and 1975 totaling $571.16 and $1,001.09, respectively. These amounts represent average hourly tip rates of $.56 and $.75, respectively, for those years. With the adjustments made in respondent's formula, we have determined that the tip rate per hour in the Palm Room was $1.70 in 1974 and 1975, and that Reyna received an average tip rate of $2.30 per hour when she worked as a cocktail waitress in 1975. In the Palm Room rotation of station assignments was accomplished in an equitable manner. Despite Reyna's assertion that customers served on her dinner shift sometimes ordered only ice cream, it can fairly be presumed that her total sales in the Palm Room were at least proportionate to the hours she worked there. Thus, the tips shown in her diary can be analyzed in terms of a percentage of sales attributable to her service as a waitress. For *110 1974 the tips shown on the tip diary submitted by Reyna amount to only 3 percent of the sales. Such a tip rate is highly unlikely when the analysis of Palm Room charge sales for 1974 reveals an average tip rate of 17.62 percent. Reyna testified that for the years at issue she accurately reported her tip income by totaling the amounts shown on her tip diary. However, she reported only $347.42 for 1974 and $605 for 1975, while her tip diary shows $571.16 and $1,001.09, respectively, for those years. No explanation was offered to reconcile these figures. It is difficult to see how her tip diary could have formed the basis for the amounts she reported. Finally, the tip diary submitted by Reyna is completely at odds with the records of the Stardust. She testified that the diary was accurate both as to amounts shown and the days she worked. The Stardust maintains detailed payroll records for its employees. Time cards punched by the employee show the exact number of hours worked each day by the employee, and time books show in what capacity the employee worked on a particular day. Reyna's tip diary shows she was on vacation from May 15, 1974 to May 31, 1974, and from August 1, 1975 to *111 August 14, 1975. Her time cards, on the other hand, show she was working throughout these periods, but that she was off work from June 12, 1974 to June 24, 1974, and from July 18, 1975 to July 29, 1975. Her tip diary shows she was working throughout these latter periods. If, as Reyna testified, she never waited longer than two weeks to make the entries in her diary, it is difficult to believe that she would have written the vacation periods in the wrong month each year. Furthermore, there are many other discrepancies between her tip diary and her time cards. We conclude on this record that both petitioners were negligent in substantially understating their tip income and in failing to keep adequate records.Therefore, the additions to tax determined by respondent under section 6653(a) are sustained. Meneguzzo v. Commissioner, 43 T.C. 824, 836 (1965); Schroeder v. Commissioner, 40 T.C. 30, 34 (1963). To reflect the concessions made by respondent and our findings and conclusions herein, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩