T.C. Memo. 2015-32

UNITED STATES TAX COURT

ALAN SABOLIC, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22187-13.                    Filed February 26, 2015.

Alan Sabolic, pro se.

<u>Wesley J. Wong</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined the following deficiencies and penalties with respect to petitioner's Federal income tax for tax years 2009-11:

|  [*2] Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2009 | $5,372 | $1,074 |
| 2010 | 4,975 | 995 |
| 2011 | 5,505 | 1,101 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

The issues for our consideration are (1) whether petitioner received unreported tip income in tax years 2009-11 and (2) whether petitioner is liable for accuracy-related penalties under section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner resided in Nevada when he filed the petition.

Petitioner has been employed as a bartender for over 20 years. He was employed at the Zuri Lounge at the MGM Grand Hotel and Casino (MGM Grand) in Las Vegas, Nevada, during tax years 2009-11. He would serve drinks to customers who sat at the six stools at his bar and to those who would walk up to the counter. In front of the stools were video poker machines. If a customer was

[*3] sitting at a stool and actively gambling on the video poker machine, petitioner would serve him or her a complimentary drink (comp). Most of petitioner's drinks served were comps. Petitioner did not work with waitresses and did not fill their orders.

Petitioner worked Monday through Thursday from 6 p.m. until 2 a.m. with an hour break each day for all three tax years. At times during the tax years at issue, petitioner varied from his usual routine to take vacations or work flexible hours. Each MGM Grand worker had an employee identification number and terminal where he or she swiped in when arriving and swiped out when leaving or taking a break.

When a customer ordered a drink from petitioner, he entered the sale into MGM Grand's point-of-sales system under his unique employee identification number. When he provided a customer with a comp, MGM Grand's point-of-sales system would internally record it with a price discounted from the usual retail price of a drink. For example, if he entered a sale from a domestic beer provided to a paying customer, the system internally recorded it at $8. But, if he entered a sale from the same domestic beer provided as a comp, the system internally recorded it at $4. The system also tracked the customer's payment for the drinks

**[*4]** purchased, including whether the purchase was made with a credit card or cash, and the amount of any tip paid by credit card or room charge.

Daily Log

During the years at issue petitioner opted not to participate in the Internal Revenue Service's (IRS) Gaming Industry Tip Compliance Agreement Program (GITCA Program).[1]  Petitioner participated in the GITCA Program for over 20 years, but he opted out of it during the tax years at issue because he felt that the automatic tip rate was too high given the economic conditions during that time.

Since petitioner opted out of the GITCA Program, he was required to self-report his cash tips to his employer and keep personal records of how much he received in tips each shift.  Petitioner had a set routine of how he recorded his tips at the end of each shift.  MGM Grand's point-of-sales system would generate a receipt that stated how much he had earned in tips from credit cards and room charges (charged tips).  He would cash out his charged tips receipt daily.  Cash tips were not internally controlled by MGM Grand's system, and so petitioner

---

[1]The GITCA Program is an IRS program that sets an automatic tip rate for participating employees.  Rather than requiring that participants keep records and report their actual tip income, the IRS allows the employer's payroll department to multiply the number of hours worked by GITCA Program participants by the applicable tip rate to arrive at taxable tip income which is then reported on the participants' Forms W-2, Wage and Tax Statement.

[*5] would personally keep track of his cash tips for each shift. Petitioner would put any change from cash tips that he received in a glass jar. He would add together his cash tips and his charged tips and enter the total into the system when he punched out. He would tip the cashier any leftover change that he received. This amount would then be automatically reported to MGM Grand's payroll department. He also kept daily a personal tip diary by recording the total on a slip of paper. His daily totals were recorded in whole numbers.

Petitioner kept both the receipts from his charged tips and his contemporaneously recorded slips of paper for 2010 and 2011. For 2009 he kept only the contemporaneously recorded slips of paper. After he submitted his tip information to MGM Grand's system, petitioner would "tip out", or give a portion of his tips to, the barback who had helped him that shift. He did not keep a contemporaneous log detailing how much he paid out to the barbacks. Petitioner gave the barbacks 10% to 20% of his total tips. Petitioner's tip diaries show that petitioner received tips of $21,849, $24,212, and $22,950 for tax years 2009-11, respectively. These amounts include the tips he gave to the barbacks but do not include the change tips he gave to the cashiers when he cashed out his charge tip receipts.

**[*6]** <u>Tax Returns</u>

Petitioner filed timely tax returns for all three years at issue.  He hired a tax return preparer to aid him in this process.  Each year he would provide his return preparer with the Form W-2 generated by MGM Grand.  The Form W-2 showed how much he had earned in tips for that year on the basis of the amounts that he reported to MGM Grand at the end of each shift.  The return preparer used that information to complete petitioner's Form 1040, U.S. Individual Income Tax Return.  Each year petitioner reduced the total tips that he received by approximately 10% to account for the tip outs to the barback at the end of each shift.  In accordance with his Forms W-2 petitioner reported income from tips of $18,110, $23,941, and $21,926 for tax years 2009-11, respectively.  He claimed deductions for the tip outs of $1,811, $2,394 and $2,193 for tax years 2009-11, respectively.

<u>Respondent's Calculation</u>

Respondent determined that petitioner had underreported his tip income for each of tax years 2009-11.  Respondent obtained petitioner's sales records from MGM Grand for the tax years at issue.[2]  These records were already broken down

---

[2]At trial and on brief respondent introduced a method of determining petitioner's income adjusted from the one that was used to generate the notice of

(continued...)

[*7] into three roughly yearlong segments that corresponded with the tax years at issue. These segments were: December 15, 2008, to December 27, 2009 (for tax year 2009), December 28, 2009, to December 26, 2010 (for tax year 2010), and December 27, 2010, to December 25, 2011 (for tax year 2011). For the segment that corresponded to tax year 2009, respondent divided the data by 377 (the number of days of the segment) and then multiplied the result by 365 to account for the discrepancy between the segment length and the calendar year. Respondent did not make this adjustment for either 2010 or 2011 as those segments more closely represented a 365-day year.

From the adjusted 2009 data and the original 2010 and 2011 data, respondent extracted three figures for each year: (1) petitioner's total charged sales, which included both credit card and room charge sales; (2) petitioner's total noncharged sales, which included both drinks purchased at full price in cash and all comped drinks; and (3) petitioner's charged tips generated by the charged sales.

Using the ratio of charged sales to charged tips respondent determined a "charge tip rate" for each tax year. To be conservative, respondent then reduced

_____

[2](...continued)
deficiency. The adjusted method resulted in assigning petitioner less tip income. Respondent conceded the difference between the amount determined using the adjusted method and the amount determined using the original method from the notice of deficiency.

[*8] the charge tip rate by 2% to arrive at the "noncharged tip rate" for each year. Respondent then reduced petitioner's total noncharged sales by a stiff rate of 15%, representing the frequency with which respondent estimated that customers did not leave any tip or "stiffed" petitioner. Respondent then applied the corresponding noncharged tip rate to petitioner's adjusted noncharged sales for each year in order to arrive at petitioner's total noncharged tip income. Respondent then added the total noncharged tip income to the total charged tip income to arrive at total tip income for each year. Respondent then reduced the total tip income by 10% to account for the tip outs petitioner gave to the barbacks at the end of each shift. Finally, from this reduced total tip income for each year, respondent subtracted the amount of tip income that petitioner had reported on his respective tax returns. After all of the adjustments and calculations respondent determined that petitioner had underreported his tip income by $19,729, $19,000, and $20,284 for tax years 2009-11, respectively.[3]

---

[3]These amounts reflect concessions that respondent made after the revised calculations which (1) adjusted the data for 2009, (2) increased the stiff rate from 5% to 15%, (3) applied the stiff rate to noncharged sales (which included cash sales and all comps) only instead of total sales, and (4) reduced respondent's total tip income calculation by 10% to represent the amounts paid to the barbacks instead of reducing it only by the amounts petitioner had reported on his tax returns.

**[*9]**                                    OPINION

Tips constitute compensation for services and are includable in gross income under section 61(a).  See Catalano v. Commissioner, 81 T.C. 8, 13 (1983), aff'd without published opinion sub nom. Knoll v. Commissioner, 735 F.2d 1370 (9th Cir. 1984); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965); sec. 1.61-2(a)(1), Income Tax Regs.

Taxpayers are required to maintain records sufficient for the Commissioner to determine their correct tax liability.  Sec. 6001; Meneguzzo v. Commissioner, 43 T.C. at 831-832.  When a taxpayer receives tips daily, he or she is required to keep an accurate and contemporaneous record of such income.  Ross v. Commissioner, T.C. Memo. 1989-682, aff'd without published opinion, 967 F.2d 590 (9th Cir. 1992); Biddle v. Commissioner, T.C. Memo. 1989-397; sec. 1.6001-1(a), Income Tax Regs.; sec. 31.6053-4, Employment Tax Regs.  Such records must be retained by the taxpayer "so long as the contents thereof may become material in the administration of any internal revenue law".  Sec. 1.6001-1(e), Income Tax Regs.

When a taxpayer fails to keep records, or maintains only incomplete or inadequate records of income, or when a taxpayer's records are no longer available, the Commissioner may recompute tips in any manner that clearly

**[\*10]** reflects income.  Sec. 446; Meneguzzo v. Commissioner, 43 T.C. at 831.

The Commissioner has great latitude in adopting a suitable method for

reconstructing the taxpayer's income.  Giddio v. Commissioner, 54 T.C. 1530,

1533 (1970).  The amount of income determined by the Commissioner need not be

exact so long as it is based on a reasonable methodology in the light of all

surrounding facts and circumstances.  Schroeder v. Commissioner, 40 T.C. 30, 33

(1963).  The use of a formula based upon the net sales of an employee in the

restaurant or bar industry is a well-established indirect method for computing tip

income.  See Cracchiola v. Commissioner, 643 F.2d 1383, 1384-1385 (9th Cir.

1981), aff'g per curiam T.C. Memo. 1979-3; McQuatters v. Commissioner, T.C.

Memo. 1973-240.

Respondent's method of recomputing income carries with it the

presumption of correctness, and petitioner has the burden of proving it wrong.  See

Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  The U.S. Court of

Appeals for the Ninth Circuit, to which an appeal in this case would lie, see sec.

7482(b)(1)(A), has held that for the presumption of correctness to attach to the

notice of deficiency in unreported income cases such as this, the Commissioner

must establish "some evidentiary foundation" connecting the taxpayer with the

income-producing activity or demonstrating that the taxpayer actually received

[*11] unreported income, see Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977); see also Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982) (holding that the Commissioner's assertion of a deficiency is presumptively correct once some substantive evidence is introduced demonstrating that the taxpayer received unreported income). If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer, who must establish by a preponderance of the evidence that the deficiency was arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.

Petitioner was employed as a bartender at the MGM Grand during the years at issue. Respondent introduced records from MGM Grand's payroll department showing that petitioner received income from his bartending activities. The burden of proof remains with petitioner. In addition, petitioner does not contend that section 7491(a) shifts the burden of proof to respondent, nor does the record establish that petitioner satisfies the section 7491(a)(2) requirements.

Petitioner argues that he has met his burden because he complied with the recordkeeping requirements of section 6001 and section 31.6053-4(a)(1), Employment Tax Regs., having kept detailed, contemporaneous daily logs which are substantially accurate. Petitioner routinely recorded the amounts of his cash

[*12] and charge tips on slips of paper at the end of each shift. Petitioner kept these logs and produced them to respondent and at trial.

Respondent contends that petitioner's logs are inadequate for several reasons. First, respondent points to the fact that the logs were recorded in whole numbers. Respondent argues that petitioner was not tipped in exact dollar amounts. Petitioner testified credibly that when he was tipped with change he would put the change in a glass jar to be mixed in with the other tips. When he would periodically cash out the change jar, he would give the change to the cashiers who cashed him out at the end of the shift. He also testified that when he cashed out daily his charged tips receipt, he would give the cashiers any change that was generated by those tips. We find petitioner's explanation credible and do not find the logs inadequate merely because the amounts are recorded in whole numbers.

Second, respondent argues that the daily tip logs are inadequate because petitioner did not keep track of how much he actually tipped out the barbacks at the end of each shift. Petitioner testified credibly that he always tipped the barbacks between 10% and 20% at the conclusion of each shift. Petitioner deducted only 10% for the tip outs on his Federal income tax return for each year at issue. When respondent recalculated petitioner's tip income, respondent

**[\*13]** allowed petitioner a reduction for tip outs of 10% for each year at issue. See Brown v. Commissioner T.C. Memo. 1996-310 (recognizing that sharing tips with coemployees reduces gross income). Although ideally petitioner should have kept track of these tip out amounts, the fact that he did not do so given the facts and circumstances does not by itself render his logs inadequate.

Third, respondent also claims that the logs are inadequate because they appear to be missing days. However, petitioner credibly testified that he sometimes took vacations or worked flexible days. To the extent that the log days do not match up with the days from the MGM Grand's records, petitioner also testified that frequently the time system would be down or faulty and cause disparities between his records and those that MGM Grand provided. We find petitioner's explanation to be credible and do not find his logbooks to be inadequate on that ground.

Finally, respondent contends that petitioner's logs are inadequate because they do not precisely match up with the information in his Forms W-2. For 2009 petitioner's log was off by $3,739. For 2010 it was off by $271. For 2011 it was off by $1,024. At trial respondent acknowledged that for 2010 the mismatch could be due to timing differences as the Form W-2 is generated on the basis of pay periods which do not correspond precisely to the calendar year. Although the

[*14] discrepancies for 2009 and 2011 are larger, they can also be partially reconciled by the pay period difference. Petitioner testified and submitted evidence that the MGM Grand time system that tracked tips had malfunctioned several times throughout the tax years at issue. Petitioner testified that these malfunctions could be responsible for his reported tips' being shifted between pay periods or possibly lost. Given petitioner's habitual careful recordkeeping, we find that his logs are a substantially accurate account of his tip income for the tax years at issue.

Additionally, petitioner presented evidence of his income and testified credibly about how he kept track of his tips. Petitioner was an experienced bartender, and he understood that if he did not participate in the GITCA program he would be required to keep daily records of his tips.

Petitioner testified about how his bar was set up and what a shift was like during the years at issue. He stated that his bar had only six stools and that customers would often sit at the stools playing poker for several hours and receive several comped drinks as a result. He testified that the only time his bar would be busy was when there was a big convention and then most of the drink sales tips would be on company credit cards rather than cash. He described the difficult

[*15] economic times that Las Vegas faced during the years at issue and how his business had decreased as a result.

Petitioner also testified about the typical tipping behavior of his patrons. Most of his drinks served were comps, and he testified that customers rarely tipped on comp drinks and that if they did they might "throw [him] a buck or two" after several hours of sitting at his bar receiving the comped drinks. Petitioner additionally testified that college kids and foreigners rarely tipped.

This Court has held that the Commissioner's method of reconstructing taxpayers' tip income is reasonable. See McQuatters v. Commissioner, T.C. Memo. 1973-240. However, we find that in this case this method does not reflect petitioner's income as accurately as petitioner's own daily records. See Krause v. Commissioner, T.C. Memo. 1992-270. There is no evidence of a discrepancy in petitioner's records that would result in the unreported income showed by respondent's calculations.

On the basis of all the evidence presented, and on this record, we find that petitioner has met his burden of proof. He has satisfied the requirement of section 31.6053-4(a)(1), Employment Tax Regs., by keeping a daily record and has reported amounts substantially the same as recorded therein. We find petitioner's

**[*16]** figures accurately reflect the tip income he earned during the years at issue. See Krause v. Commissioner, T.C. Memo. 1992-270.

We find that petitioner fully reported his tip income on his 2009, 2010, and 2011 Federal income tax returns.  We do not sustain respondent's deficiency determinations and therefore need not decide whether accuracy-related penalties under section 6662(a) would be appropriate.

Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered

for petitioner.