T.C. Summary Opinion 2015-64

UNITED STATES TAX COURT

JOSEPH J. CALVANICO AND KELLY ANNE K. CALVANICO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21252-13S.                      Filed November 9, 2015.

Joseph J. Calvanico and Kelly Anne K. Calvanico, pro sese.

<u>Michael T. Shelton</u> and <u>Elizabeth S. McBrearty</u>, for respondent.

SUMMARY OPINION

GUY, <u>Special Trial Judge</u>: This case was heard pursuant to the provisions

of section 7463 of the Internal Revenue Code in effect when the petition was

filed.[1] Pursuant to section 7463(b), the decision to be entered is not reviewable by

_____

[1]Unless otherwise indicated, section references are to the Internal Revenue

(continued...)

any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a deficiency of $13,368 in petitioners' Federal income tax for 2010 (year in issue) and an accuracy-related penalty of $2,673 under section 6662(a). Petitioners, husband and wife, resided in Illinois at the time they filed their petition for redetermination with the Court.

The issues for decision are whether: (1) a deduction for a $40,963 loss that petitioners reported on Schedule E, Supplemental Income and Loss, is precluded by the passive activity loss rules prescribed in section 469 and (2) petitioners are liable for an accuracy-related penalty under section 6662(a).

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

## I. Petitioners' Backgrounds

Mr. Calvanico is a licensed real estate appraiser. He earned a bachelor of arts degree in economics from the University of Wisconsin and a master of science

---

[1](...continued)
Code, as amended and in effect for 2010, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

degree in real estate law from John Marshall Law School. During January and February 2010 he worked full time as the director of real estate valuation and property tax at Grant Thornton. During the remainder of 2010 he served as the director of national property tax and real estate valuation at Crowe Horwath. He did not own an equity interest in either business.

Mrs. Calvanico earned a bachelor's degree from the University of Massachusetts and a law degree from the University of Virginia. During 2010 she cared for her infant son, worked part time as an independent contractor providing consulting services to nonprofit organizations, and, with Mr. Calvanico's help, managed and maintained three rental properties.[2]

## II. Petitioners' Rental Real Estate Activities

### A. Rental Properties

Petitioners were married in 2006. At that time Mrs. Calvanico owned a single condominium (Unit 918) which she had previously used as her personal residence. Mr. Calvanico owned two condominiums (Units 522 and 801), one of which he had previously used as his personal residence. Each unit was subject to a separate mortgage. When petitioners married, they pledged the three units as

---

[2]Petitioners' son was born on November 29, 2009. Mrs. Calvanico's mother occasionally assisted her in caring for her son.

collateral and obtained a loan to purchase an additional condominium (in the same building as Units 522 and 801) for use as their new personal residence.

Beginning in 2006 and throughout the year in issue, petitioners operated Units 522, 801, and 918 as rental properties. The parties stipulated that petitioners did not hire a property manager to assist with their rental properties in 2010.[3]

B. Difficulties With Tenants

Mr. Calvanico testified that the tenant in Unit 522 did not pay rent for January and February 2010 and that he subsequently informed petitioners that he was bankrupt and would have to break his lease. Mr. Calvanico further testified that after giving the tenant 15 days to move out "we spent the next 45 days just dealing with that property alone." Mrs. Calvanico recalled that the tenants in Units 522 and 801 had both moved out in December 2009.

Petitioners leased Unit 522 to a new tenant in March or April 2010. Although new tenants moved into Unit 801 in April 2010, those tenants abruptly broke the lease about 30 days later. A new tenant subsequently moved into Unit 801 in July 2010. A single tenant occupied Unit 918 throughout 2010.

_____

[3]Although the parties' stipulation seems to conflict with a "management fee" expense of $17,136 that petitioners reported on Schedule E attached to their tax return for 2010, the discrepancy does not affect the Court's analysis.

C. Petitioners' Personal Services

Mr. Calvanico testified that in 2010 he spent more than 750 hours performing personal services in support of the couple's rental real estate activities. Although he stated that he performed maintenance and repair services, he did not provide a log or other written record of the number of hours that he devoted to rental real estate activities.

Mrs. Calvanico testified that in 2010 she worked about 855 hours in support of the couple's rental real estate activities. The record includes copies of her handwritten notes and logs of her activities. As discussed below, the logs were created after petitioners' tax return was selected for examination.

1. Maintenance and Repairs

Although petitioners shared responsibility for managing and maintaining the rental properties, their testimony was sometimes inconsistent regarding the division of labor between them. Mr. Calvanico testified that, because of the recent birth of their son and the time that Mrs. Calvanico devoted to his care, she "wasn't doing a lot of the physical labor" associated with the repair and upkeep of the rental properties. Mrs. Calvanico testified, however, that she worked long hours, particularly in January 2010, cleaning, painting, and repairing Units 522 and 801.

2. Foreclosure Actions/Refinancing Efforts

Petitioners were not receiving steady rental payments in 2009, and they encountered difficulties in making the monthly mortgage payments due on their rental properties. Although the record is not a model of clarity on this point, it appears that petitioners were late or delinquent in making certain mortgage payments, and they contacted CCO Mortgage (CCO), a subsidiary of Charter One Bank, to seek assistance. Unfortunately, by early spring 2010 petitioners found themselves unwilling participants in an institutional "tug-of-war" between CCO's loss mitigation and loan default departments. By the end of 2010, despite petitioners' attempts to obtain refinancing from several other banks, all three of their rental properties were the subjects of foreclosure actions.

Mrs. Calvanico testified that she and Mr. Calvanico spent numerous hours on the telephone attempting to refinance the mortgages on the rental properties. She testified that while she was on hold at home Mr. Calvanico was likewise on hold at work (sometimes for up to four hours at a time) and she would notify him by text message when a representative from the mortgage lender answered the call.

3. Mrs. Calvanico's Notes and Records

Mrs. Calvanico made handwritten notes on scraps of paper which she collected in an envelope and used to create "a guesstimate" of the amount of time

she spent on a particular rental activity. She also kept a folder in her car to collect receipts for expenditures related to the rental properties. Mrs. Calvanico admitted that her handwritten notes were "not the clearest". The handwritten notes are at best cryptic and generally difficult to decipher.

Mrs. Calvanico kept additional records and emails related to meetings with lawyers and communications that petitioners had with various banks concerning the foreclosure actions mentioned above.

III. Petitioners' 2010 Tax Return

Petitioners used H&R Block software to prepare and file Form 1040, U.S. Individual Income Tax Return, for 2010. Petitioners attached to their return a Schedule E, reporting that they had received gross rental income of $40,996 in respect of the three rental properties, offset by various expenses totaling $53,816 and depreciation of $28,143, resulting in a net loss of $40,963.[4] Petitioners reported the latter amount as a loss on line 17 on Form 1040.

Petitioners also attached to their return a Schedule C-EZ, Net Profit From Business, reporting that Mrs. Calvanico had earned gross receipts of $20,000 as a

---

[4]Respondent does not dispute that petitioners incurred the net loss that they reported on Schedule E.

consultant in 2010.  The record does not include any objective evidence of the number of hours that Mrs. Calvanico devoted to this activity.

IV.  Examination

The Internal Revenue Service (IRS) selected petitioners' tax return for examination, and they initially turned to H&R Block for assistance in responding to requests for information.  Mrs. Calvanico provided Queen Teague, an H&R Block employee, with copies of her handwritten notes and other materials related to her rental activities.  Mrs. Calvanico did not provide Ms. Teague with any notes related to the time she and her husband spent attempting to refinance the mortgages on the rental properties.  After some delay and ostensibly after petitioners had severed ties with H&R Block, Ms. Teague sent a rental activity log to the IRS indicating that Mrs. Calvanico had spent 938 hours providing personal services in connection with rental real estate activities in 2010.  Petitioners did not have the opportunity to review the H&R Block activity log before it was submitted to the IRS.

V.  Mrs. Calvanico's Log

Shortly before trial Mrs. Calvanico reviewed the H&R Block activity log and determined that it was inconsistent in some respects with her handwritten notes and other records.  She subsequently prepared and submitted to respondent's

counsel a revised activity log indicating that she had performed 855 hours of personal services in connection with rental real estate activities in 2010. Mrs. Calvanico's revised activity log includes an itemized list of the hours that she devoted to various rental real estate activities including cleaning and repairing all three of the rental properties and the hours that she spent attempting to find suitable tenants for Units 522 and 801. The revised activity log also describes the time that she spent consulting with an attorney related to the foreclosure actions in respect of all three properties and lists a lump sum of 235 hours that she spent attempting to refinance the mortgages on the three properties.

## VI. Notice of Deficiency and Petition

Respondent issued a notice of deficiency to petitioners determining that they may not deduct the rental real estate activity loss they reported on Schedule E because (1) their rental real estate activities were passive activities under section 469(c)(2) and (2) they were are not eligible for the limited exception prescribed in section 469(i).[5]

_____

[5]Sec. 469(i) provides a limited exception to the general passive activity loss rule of subsec. (a) in that a natural person is permitted to deduct up to $25,000 of a passive activity loss for any taxable year which is attributable to all rental real estate activities with respect to which such individual actively participated. The deduction is phased out as adjusted gross income, modified by sec. 469(i)(3)(F), exceeds $100,000, with complete phaseout occurring when modified adjusted

(continued...)

Petitioners assert in their petition that they are entitled to deduct the rental real estate activity loss in dispute because they qualify as real estate professionals under section 469(c)(7)(B). They further assert that there is no deficiency or understatement of tax for the year in issue that would justify an accuracy-related penalty.

## Discussion

As a general rule, the Commissioner's determination of a taxpayer's liability in a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[6]

Deductions are a matter of legislative grace, and the taxpayer generally bears the burden of proving entitlement to any deduction claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). A taxpayer must substantiate deductions

---

[5](...continued)
gross income equals $150,000. Petitioners do not dispute that they are precluded from taking advantage of this exception because of the phaseout rules of sec. 469(i)(3).

[6]Petitioners do not contend that the burden of proof should shift to respondent pursuant to sec. 7491(a), and there is no support in the record for doing so. Therefore, the burden of proof remains on petitioners. See Rule 142(a).

claimed by keeping and producing adequate records that enable the Commissioner to determine the taxpayer's correct tax liability.  Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965).

I.  Passive Loss Rules

Taxpayers are allowed deductions for certain business and investment expenses under sections 162 and 212.  Section 469(a)(1), however, generally disallows for the taxable year any deduction for passive activity losses and credits. A passive activity loss is defined as the excess of the aggregate losses from all passive activities for a taxable year over the aggregate income from all passive activities for that year.  Sec. 469(d)(1).  A passive activity is any activity that involves the conduct of a trade or business or the expenses of which are deductible under section 212, in which the taxpayer does not materially participate.  Sec. 469(c)(1), (6)(B).

A rental activity generally is treated as a per se passive activity regardless of whether the taxpayer materially participates.  Sec. 469(c)(2), (4).  The term "rental

activity" is defined as any activity where payments are principally for the use of tangible property. Sec. 469(j)(8).[7]

Under section 469(c)(7)(B), however, the rental real estate activity of a taxpayer who qualifies as a real estate professional is not a per se passive activity under subsection (c)(2) for a taxable year but is treated as a passive activity under paragraph (1) unless the taxpayer materially participated in the activity. Sec. 1.469-9(e)(1), Income Tax Regs.[8]

A taxpayer qualifies as a real estate professional under section 469(c)(7)(B) if (i) more than one-half of personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates and (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property

---

[7]An activity involving the use of tangible property will not be considered a rental activity for a taxable year, however, if for such taxable year the average period of customer use for such property is seven days or less. Sec. 1.469-1T(e)(3)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).

[8]A taxpayer shall be treated as materially participating in an activity only if the taxpayer is involved in the operations of the activity on a continuous, regular, and substantial basis. Sec. 469(h)(1); see sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988) (identifying various tests to determine whether a taxpayer satisfies the material participation requirement). In determining whether a taxpayer materially participates, the participation of the taxpayer's spouse shall be taken into account. Sec. 469(h)(5).

trades or businesses in which the taxpayer materially participates.[9] "Personal services" means any work performed by an individual in connection with a trade or business. Sec. 1.469-9(b)(4), Income Tax Regs.[10] The flush language of section 469(c)(7)(B) provides that, in the case of a joint return, the requirements set forth in subparagraph (B) are satisfied "if and only if either spouse separately satisfies such requirements". See Moss v. Commissioner, 135 T.C. 365, 368 (2010).

In computing the number of hours that a taxpayer performs services in real property trades or businesses during a taxable year, personal services performed as an employee shall not be taken into account unless the employee is a 5% owner (as defined in section 416(i)(1)(B)) in the employer. See sec. 469(c)(7)(D)(ii); sec. 1.469-9(c)(5), Income Tax Regs.[11]

_____

[9]The term "real property trade or business" means any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business. See sec. 469(c)(7)(C).

[10]Respondent does not dispute that petitioners' rental real estate activities constituted a trade or business during the year in issue.

[11]A 5% owner for purposes of sec. 469(c)(7)(D)(ii) is defined in sec. 416(i)(1)(B)(i), which provides:

(I) if the employer is a corporation, any person who owns (or is

(continued...)

The evidence that a taxpayer may use to establish the number of hours that he or she participates in a real property trade or business is described in section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), as follows:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

## II. Whether Petitioners Are Real Estate Professionals

As previously mentioned, petitioners contend that they both qualified as real estate professionals in 2010 within the meaning of section 469(c)(7). Mr. Calvanico asserts that he was a real estate professional because he worked full time as a licensed real estate appraiser. Both petitioners maintain that they

[11](...continued)
considered as owning within the meaning of section 318) more than 5 percent of the outstanding stock of the corporation or stock possessing more than 5 percent of the total combined voting power of all stock of the corporation, or

(II) if the employer is not a corporation, any person who owns more than 5 percent of the capital or profits interest in the employer.

performed more than 750 hours of personal services while managing and maintaining their rental properties.

A.  Mr. Calvanico

Mr. Calvanico's reliance on work that he performed for Grant Thornton and Crowe Horwath to show that he qualified as a real estate professional in 2010 is misplaced.  In short, he testified that he did not own an equity interest in either firm, and he did not offer any other evidence in support of the proposition that he met the definition of a "5-percent owner" of either firm within the meaning of section 416(i)(1)(B).  Therefore, the personal services that he performed as an employee of those firms may not be taken into account in computing the number of hours that he performed personal services in real property trades or businesses. See sec. 469(c)(7)(D)(ii); sec. 1.469-9(c)(5), Income Tax Regs.

Mr. Calvanico testified that in addition to his work as a real estate appraiser he performed more than 750 hours of  personal services in support of the couple's rental real estate activities.  A review of the record shows very little in the way of objective evidence in support of Mr. Calvanico's testimony.  Although we are convinced that Mr. Calvanico performed repair work and assisted in maintaining the couple's rental properties in 2010, we are not convinced on this record that he

performed personal services in real property trades or businesses in excess of 750 hours as required by section 469(c)(7)(B).

B. Mrs. Calvanico

Mrs. Calvanico likewise maintains that she performed in excess of 750 hours of personal services related to the couple's rental properties. Although we have no reason to doubt that Mrs. Calvanico devoted many hours to the management and upkeep of the rental properties, we are not persuaded that she qualified as a real estate professional in 2010.

Petitioners' testimony was inconsistent regarding the division of labor between them and the timing of significant events. As to the division of labor, Mr. Calvanico stated, quite candidly we believe, that Mrs. Calvanico did little physical labor after the birth of their son in late November 2009. In contrast, Mrs. Calvanico testified (and her revised log indicates) that she spent many long days in the first weeks of January 2010 cleaning, painting, and repairing Units 522 and 801. There is also a question of when repair and maintenance work was actually performed in Unit 522. In this regard, Mr. Calvanico suggested that the tenant in Unit 522 did not move out until late February or mid-March 2010, whereas Mrs. Calvanico recalled (and her revised log suggests) that he had moved out in December 2009.

Against this backdrop, we bear in mind that Mrs. Calvanico did not maintain a contemporaneous log of her rental property activities and instead made handwritten notes on scraps of paper that she did not review in any great detail until a few weeks before trial. A close examination of the revised log that she submitted to respondent's counsel raises serious doubts about its accuracy. For example, Mrs. Calvanico reported that from January 2 to January 8 she devoted a total of 60 hours to Unit 801, comprising 42 hours cleaning, painting, and repairing the unit, 5 hours preparing for and supervising a cleaning crew, and 13 hours (on January 8) posting a listing for the unit on Craigslist and creating flyers and hanging them around the neighborhood. Overlapping some of those activities, Mrs. Calvanico reported that from January 5 to January 11 she devoted a total of 94 hours to Unit 522, comprising 90 hours cleaning, painting, and repairing the unit and 4 hours (on January 8) posting listings for the unit on Craigslist and the Reader. She also reported that she first began showing Units 522 and 801 on January 9. Thus, for the period January 2 to January 11, Mrs. Calvancio's revised log indicates that she worked at least 154 hours--an average of slightly more than 15 hours per day for the 10-day period--not counting any time that she may have spent showing either unit to prospective tenants. We find it improbable that Mrs. Calvanico performed all of the work described above.

We are not persuaded that the methods that Mrs. Calvanico used to approximate the time that she spent performing personal services related to rental real estate activities are reasonable within the meaning of section 1.469-5T(f)(4), Temporary Income Tax Regs., supra, or that the revised log accurately accounts for the hours that she performed personal services. By her own admission, the revised log is based largely on handwritten notes containing estimates of the number of hours that she devoted to particular activities. A "ballpark guesstimate" is not sufficient to establish the extent of an individual's participation in an activity. See Hill v. Commissioner, T.C. Memo. 2010-200, aff'd, 436 F. App'x 410 (5th Cir. 2011); Bailey v. Commissioner, T.C. Memo. 2001-296. Accordingly, we conclude that Mrs. Calvanico's log inflates the number of hours that she performed personal services in respect of rental real estate activities and that she did not qualify as a real estate professional in 2010.

C. Conclusion

Because we conclude that petitioners were not real estate professionals in 2010 within the meaning of section 469(c)(7), we sustain respondent's

determination that they are not entitled to a deduction for the rental real estate activity loss in dispute.[12]

III. Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty equal to 20% of the amount of any underpayment of tax that is due to the taxpayer's negligence or disregard of rules or regulations or that is attributable to any substantial understatement of income tax. By definition, an understatement means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). The $13,368 understatement of tax in this case satisfies the definition of a substantial understatement of income tax.

With respect to an individual taxpayer's liability for any penalty, section 7491(c) places on the Commissioner the burden of production, thereby requiring the Commissioner to come forward with sufficient evidence indicating that it is

_____

[12]Under the circumstances, we need not decide whether petitioners materially participated in real property trades or businesses as required under sec. 469(c)(7).

appropriate to impose the penalty. <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2000). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. <u>Id.</u> at 447; <u>see</u> Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. at 115. Respondent met his burden of production in this case inasmuch as we have sustained respondent's determination that petitioners are not entitled to a deduction for the rental real estate activity loss in dispute.

Petitioners did not offer a defense to the imposition of an accuracy-related penalty in this case other than to assert that respondent erred in determining a deficiency. That matter having been resolved against them, respondent's determination that petitioners are liable for an accuracy-related penalty under section 6662(a) is sustained.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.